THE ENVIRONMENTAL PROTECTION AGENCY, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

First District (5th Division)    No. 78-2114

Opinion filed August 1, 1980.—Rehearing denied October 1, 1980.

William J. Scott, Attorney General, of Chicago (Dean Hansell and Judith S. Goodie, Assistant Attorneys General, of counsel), for petitioner.

Clifton A. Lake and Johnnine Brown Hazard, both of Rooks, Pitts, Fullagar & Poust, of Chicago, for respondent United States Steel Corporation.

Mr. JUSTICE MEJDA delivered the opinion of the court:

The Illinois Environmental Protection Agency (Agency) appeals from an order of the Illinois Pollution Control Board (Board) directing the Agency to issue an operating permit, which it had previously denied, to United States Steel Corporation (U.S. Steel). On appeal, the Agency contends that: (1) the Board improperly relied on its own knowledge concerning a question of fact never before raised by the Board and not a part of the record before the Agency; (2) the Board improperly shifted the burden of proof from U.S. Steel to the Agency; and (3) the Board's interpretation of Rules 203(a), (b) and (f) of the Air Pollution Control Regulations was erroneous in that it departs from the Board's previous interpretation and is not supported by the plain language or regulatory history of the rules. U.S. Steel raised two additional points in motions that we agreed to take with the case. It contends that: (1) the Agency has no standing to appeal the Board's decision; and (2) the appeal is moot because of the Board's adoption of new Air Pollution Control Regulations which specifically apply to the emissions here in question. We reverse.

The following facts were submitted to the Board in the review proceedings in the form of a stipulation of facts and the Agency's record, which included U.S. Steel's permit application, the Agency's correspondence denying the application, U.S. Steel's written responses and the Agency's calculations on the permit application.

U.S. Steel's Chicago South Works, on Chicago's far southeast side, employs approximately 10,000 persons and contains facilities for the production of iron and the making, shaping and treating of steel. Among the facilities at the South Works are four blast furnaces, which were the subject of applications for operating permits which U.S. Steel filed with

the Agency on October 3, 1977. A blast furnace is basically a vertical shaft furnace. Reactant materials, such as iron ore, sinter and limestone, are heated and melted in the furnaces by preheated combustion air which is injected into the furnace through truyeres at the bottom. The reactants eventually change into molten iron, which collects at the bottom of the furnace. When the level of molten iron is sufficiently high, the furnace's tap is opened and the molten iron is poured into waiting ladle cars for transfer to the steel-making area. This "casting" or "tapping" operation takes place in the "cast house," which contains a roof monitor, doors and other openings.

The blast furnace operation emits particulate matter from the stove stack and the cast house. Gas generated in the melting process is removed and cleaned and then reused as a combustion fuel in the stoves that heat the combustion air. Some particulates are emitted from the stove stack after the gas cleaning process. The casting process also produces particulate emissions, primarily iron oxide which results from the contact of the molten iron with cooler air during casting. These emissions reach the atmosphere through the various openings in the cast house. The cast house emissions are unavoidably produced and released during the casting process. They are not controlled by U.S. Steel, and particulate controls for molten iron casting operations in connection with basic iron blast furnace operations are not used by any other operator in Illinois.

Standards and limitations for particulate emissions are governed by Rule 203 of Chapter II of the Air Pollution Control Regulations adopted by the Board. The Agency took the position that the four blast furnaces must comply with Rule 203(a) and that the cast house emissions are to be included in measuring the particulate matter that reaches the atmosphere during the casting process. The amount of cast house emissions is determined by multiplying the number of tons of metal tapped by a cast house emissions factor. Prior to 1977, the Agency granted operating permits for basic iron blast furnaces without requiring controls for the cast house emissions because the emission factor necessary to calculate cast house emissions was not yet known. In 1977, after conducting tests in conjunction with Bethlehem Steel Corp., Dominion Foundries of Canada and Ford Motor Co., the United States Environmental Protection Agency (USEPA) found that cast houses have emission factors ranging from .26 to .6 pounds per ton of metal tapped. The USEPA selected .3 pounds per ton as a conservative estimate which is now used by the USEPA in quantifying basic iron blast furnace casting emissions. The Illinois Agency took notice of the USEPA factor and, beginning in 1977, took cast house emissions into consideration in determining compliance with Rule 203.

The allowable emission load based on the amount of material charged per hour, or the process weight rate, was computed under Rule

203, while the actual emissions per hour were calculated on the basis of the USEPA .3 cast house emission factor. Each of the furnaces was found to emit particulate matter from their cast houses in excess of the amount allowed under Rule 203(a), and the Agency accordingly refused to grant the permits.

U.S. Steel was notified of the Agency's decision in a letter dated June 22, 1977. On October 3, 1977, the Agency received a letter from U.S. Steel in response to the denial of the operating permit. U.S. Steel took exception to the Agency's interpretation of the rules, maintaining that the cast house emissions were fugitive emissions that were subject to, and in this instance in compliance with, Rule 203(f). The Agency treated the letter as a reapplication and, on October 31, 1977, restated its denial of the permits for lack of compliance with Rule 203(a). On December 9, 1977, U.S. Steel filed its petition for review with the Board. The Agency's motion to dismiss the review on the grounds that it was untimely filed was denied by the Board and, following the Agency's filing of the permit application record with the Board, the matter proceeded to a hearing. No testimony was taken. The Agency and U.S. Steel submitted a stipulation of facts and filed separate briefs. On September 7, 1978, the Board issued an opinion and order directing the Agency to grant the permit sought by U.S. Steel. The Board denied the Agency's motion for rehearing or reconsideration on November 16, 1978, and the Agency subsequently filed a petition for review in this court pursuant to the provisions of the Environmental Protection Act (Ill. Rev. Stat. 1977, ch. 111½, pars. 1001 through 1051) and Supreme Court Rule 335 (Ill. Rev. Stat. 1977, ch. 110A, par. 335).

OPINION

## I.

We will first address the issues raised by U.S. Steel's motions as to whether or not this appeal should be considered.

## A.

U.S. Steel maintains that the Agency has no standing to bring this appeal because review was sought under Supreme Court Rule 335 and section 29 of the Environmental Protection Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1029). U.S. Steel contends that only section 41 of the Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1041) could give the Agency standing, but that the Agency should not have standing to appeal because it is "simply a handmaiden of the Board" in matters pertaining to the issuance of permits. We disagree.

U.S. Steel relies on *Department of Registration & Education v. Aman* (1973), 53 Ill. 2d 522, 292 N.E.2d 897, in which the court observed that no

universal principle could be established to authorize a governmental agency to seek administrative review of the decision of another agency. The court stated:

"[I]n each instance the question must be determined by the pertinent statutory provisions, the relationship which the agencies bear to each other, and the nature of the controversy out of which the administrative decision arises." (53 Ill. 2d 522, 525, 292 N.E.2d 897, 898.)

Application of the test set out in *Aman* compels the conclusion that the Agency has standing to seek review of the Board's decision in the instant case.

First, the statutory provisions relevant to review of actions of the Board clearly allow the Agency to appeal. Section 41 of the Act allows "[a]ny party to a Board hearing" to seek review in the appellate court (Ill. Rev. Stat. 1977, ch. 111½, par. 1041), while section 40 requires that the Agency appear as respondent in an action before the Board to contest the Agency's refusal of an operating permit (Ill. Rev. Stat. 1977, ch. 111½, par. 1040). The Agency thus having been made a party to the action before the Board, it may seek review of the Board's decision.

Furthermore, the Act as a whole establishes distinct roles and powers of the Agency and the Board. While the Board's principal function is in the promulgation of regulations defining the requirements of the permit system (Ill. Rev. Stat. 1977, ch. 111½, par. 1005(b)), it is for the Agency to determine whether or not specific applicants are entitled to a permit (Ill. Rev. Stat. 1977, ch. 111½, pars. 1004 and 1039). However, the Agency is in no way answerable to the Board for its actions, nor can it be considered subservient to the Board. The independent role of the Agency in the permit granting process was acknowledged by our supreme court in *Landfill, Inc. v. Pollution Control Board* (1978), 74 Ill. 2d 541, 387 N.E.2d 258. The court there held that two Board rules, which allowed the issuance of a permit to be contested before the Board, were unauthorized extensions of the Board's statutory powers because they resulted in making the Board the permit-granting authority. Similarly, the fact that the Agency must abide by the rules as promulgated and interpreted by the Board does not make the Agency the Board's "handmaiden" in permit application matters. Such a conclusion disregards the separate roles of the Agency and the Board and is inconsistent with the Act as well as with our supreme court's observations in *Landfill*.

Moreover, contrary to U.S. Steel's contention, more than a mere challenge to the Board's own interpretation of its regulations may arise on an appeal. As is the case here, such questions as the propriety of the Board's actions and the scope of its review powers may be presented. It is inconceivable that an applicant who has received a permit by virtue of the Board's review and reversal of the Agency's prior denial would raise

such challenges to the Board's decisions, yet the Board is no less likely to err in reversing the Agency as in affirming it.

■■ To say that the Agency may not appeal the Board's decision would be to allow the question of appealability to be determined, in effect, by the Board's decision itself, despite the express language of section 41, which allows appeal by "any party," and despite the stated policy of the legislature found in the Act as a whole. (Ill. Rev. Stat. 1977, ch. 111½, pars. 1001 through 1051.) Accordingly, we conclude that the Agency has standing to appeal.

## B.

U.S. Steel next contends that the appeal has been rendered moot because the Board has amended Air Pollution Control Regulation Rule 203(d), and Rule 203(d)(5)(D) now specifically applies to particulate emissions from blast furnace cast houses. Although amended Rule 203(d) is now in effect, the date for full compliance with the emissions standards and limitations, according to Rule 203(d)(5)(L)(ii) is December 31, 1982, and U.S. Steel apparently has not yet established an approved Compliance Program as required by Rule 203(d)(5)(L)(iii). Thus, U.S. Steel is still subject to the rules involved in this appeal.

That U.S. Steel recognizes the continued applicability of the rules in question here is reflected in its application for new operating permits for the blast furnaces that are the subject of this case. U.S. Steel had been granted operating permits for the furnaces pursuant to the Board's order of November 16, 1978. The Agency issued the permits for one year, but denied U.S. Steel's application for new permits upon the expiration of the permits on November 16, 1979. U.S. Steel again sought a review of the permit denial before the Board, seeking a reversal of the Agency on res judicata grounds because of the Board's order of November 16, 1978. U.S. Steel made no mention of amended Rule 203(d)(5)(D) in either its new application or the subsequent petition for review.

We also note that on February 21, 1980, the USEPA accepted certain parts of the new rules but specifically reserved its judgment on rules pertaining to the steel industry. If the new rules are rejected by the USEPA, the old rules will be reinstated.

■■ Moreover, even assuming that the question is moot, we believe that the issues regarding the relative roles of the Agency and Board in contested permit proceedings are of sufficient public interest to warrant consideration. Three criteria must be considered in order to invoke the public interest exception to the mootness rule: (1) the public nature of the question; (2) the desirability of an authoritative determination for the purpose of guiding public officers; and (3) the likelihood that the question will recur. (*Hill v. Murphy* (1973), 14 Ill. App. 3d 668, 670-71, 303 N.E.2d

208, 210.) The legislative declaration found in section 2 of the Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1002) reflects the importance of environmental matters to both private citizens and the government and the intention of the legislature to establish a unified statewide program to remedy environmental damage which seriously endangers the public health. The need for the agencies charged with the responsibility of promulgating and enforcing environmental standards to understand their respective roles is great in light of the importance the legislature has attached to environmental matters. Because of the number of permits requested each year, and because of the number of Agency decisions that are contested before the Board, it is likely that the questions here will continue to arise. Thus, even if the particular permit at issue here were moot, we would consider the Agency's appeal on its merits under the public interest exception outlined in *Hill v. Murphy.*

We will therefore consider the specific issues raised by the Agency.

## II.

At the heart of this appeal is the question of the scope of the Board's authority in reviewing the Agency's denial of U.S. Steel's permit application. U.S. Steel characterizes the issue before us as a matter of the Board's interpretation of its own rules and maintains that the Board's review of the Agency's action is complete and *de novo* and is not subject to reversal unless the Board's actions were unreasonable, arbitrary or capricious. The Agency, on the other hand, contends that the Board relied on its own expertise, considered facts not in the record and decided a factual question never before raised by the Board. In so doing, the Agency urges, the Board rendered a decision that was against the manifest weight of the evidence, that improperly shifted the burden of proof to the Agency and that misapplied Rules 203(a), (b) and (f) of chapter II of the Board's Air Pollution Control Regulations. We agree.

Preliminarily, we note that the Board is empowered by the Act to perform both quasilegislative and quasijudicial functions and the appropriate standard for review in this court depends on the nature of the Board's action. (See *Wells Manufacturing Co. v. Pollution Control Board* (1978), 73 Ill. 2d 226, 383 N.E.2d 148; *Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 288-91, 367 N.E.2d 684, 689-90.) Although the Board here applied and interpreted Rules 203(a), (b) and (f), it was not acting in its quasilegislative, rulemaking capacity which invokes the unreasonable, arbitrary or capricious standard of review. (*Monsanto.*) Instead, the Board's actions were judicial, for they were to review the Agency's denial of the permit to U.S. Steel, pursuant to section 40 of the Act. (Ill. Rev. Stat. 1977, ch. 111½, par. 1040.) Consequently, the proper standard for our review of the Board's decision is whether the Board's

action is contrary to the manifest weight of the evidence. *Wells Manufacturing Co.*

■■ In reviewing the Agency's permit denial, the Board was bound by the record submitted to it (*City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 313 N.E.2d 161), and any evidence which it considered must have been introduced as such. (*Hazelton v. Zoning Board of Appeals* (1977), 48 Ill. App. 3d 348, 363 N.E.2d 44.) The Board heard no evidence. The facts of the proceedings before the Agency were submitted to the Board in the form of a stipulation between the Agency and U.S. Steel and the respective parties argued their positions in briefs filed with the Board. The actual Agency record comprised U.S. Steel's application, the Agency's calculations and permit denial, and U.S. Steel's written responses to the Agency. The Board was thus confined to the agreed facts in the stipulation and to the Agency's record in reviewing the Agency's decision. This the Board did not do.

In its opinion and order of September 7, 1978, the Board first noted that there was no issue of fact before it. However, it went on to characterize the ultimate question as one of fact for which there was "an unfortunate lack of information." Although the Agency had found that U.S. Steel had not demonstrated compliance with the emission standards of Rule 203(a), U.S. Steel argued to the Board that the cast house emissions were fugitive emissions governed by Rule 203(f), with which the emissions complied. Whether or not the cast house emissions were fugitive emissions as defined by Rule 201 had not been considered by the Agency. That question, the Board stated, was to be determined by the physical characteristics of the emissions.

Having found that the applicability of Rule 203(f) rested on a factual determination of the nature of the emissions for which there was inadequate information in the record, the Board at the very least should have remanded the matter to the Agency for further findings of fact. Instead, the Board turned to its own knowledge and noted that the casting operation could involve everything from easily collectible emissions to fugitive particulate matter. It then concluded that the casting operation in question produced fugitive emissions and were thus governed exclusively by Rule 203(f). The Board then ordered the Agency to issue the operating permit to U.S. Steel. Athough the Board's order of September 7, 1978, contained no finding of U.S. Steel's compliance with Rule 203(f), it entered an order on November 16, 1978, which, in denying the Agency's motion for rehearing or reconsideration, expressly found compliance with Rule 203(f) and the nonapplicability of Rules 203(a) and (b).

In addition to resolving a factual issue that was for the Agency to decide, the Board erred in relying on its own expertise rather than the record in finding that the cast house emissions were fugitive emissions.

(*Smith v. Department of Registration & Education* (1952), 412 Ill. 332, 106 N.E.2d 722; *Craig v. Pollution Control Board* (1978), 59 Ill. App. 3d 65, 376 N.E.2d 1021.) The rule requiring an administrative body to base its decision on evidence in the record has a twofold purpose of affording the parties the full opportunity to know what evidence is submitted and considered in the administrative proceedings while providing sufficient information to allow an adequate judicial review. (See *Smith v. Department of Registration & Education; Farney v. Anderson* (1978), 56 Ill. App. 3d 677, 372 N.E.2d 151.) The *Farney* court explained the rule in the context of a medical license revocation proceeding:

"To determine manifest weight of evidence in an area not of one's own training and education becomes a difficult task at best, and it becomes impossible when only one pan of scales is filled. The *Smith* court put it tersely: 'This court possesses neither medical learning nor powers of telepathy. We are, therefore, unable to medically evaluate the testimony in this record or to know what scientific appraisal of it was made by the medical committee.' [Citation.]" (56 Ill. App. 3d 677, 682, 372 N.E.2d 151, 154.)

The Board's notation that the facts were inadequate, followed by a general statement that it based its findings on the record does little to assist this court in evaluating the record. There is nothing which indicates the basis for the Board's conclusion that the emissions were fugitive rather than easily collectible, when the Board had stated that the casting operation may produce particulate matter that could run the gamut from one extreme to the other regarding collectibility.

Furthermore, we find no figures in U.S. Steel's application, nor does U.S. Steel point to any, which indicate that the supposedly fugitive emissions were measured in accordance with Rule 203(f) and are in compliance with that rule. The burden of establishing compliance was with U.S. Steel both in the permit application and the subsequent review before the Board (Ill. Rev. Stat. 1977, ch. 111½, pars. 1039 and 1040). By ordering the Agency to issue the permit the Board effectively shifted the burden to the Agency to establish U.S. Steel's noncompliance. The result is thus inconsistent with the statute as well as the Board's own past acknowledgments that the question before it in the review of the Agency's denial of a permit is whether the Agency erred (*School Building Com. v. Environmental Protection Agency* (1971), 2 Ill. P.C.B. Op. 681), not whether the Board is persuaded by new material that was not before the Agency that the permit should be granted. *Soil Enrichment Materials Corp. v. Environmental Protection Agency* (1972), 5 Ill. P.C.B. Op. 715.

The Agency's final contention is that the Board erred in its application of Rules 203(a), (b) and (f) in that the Board's interpretation marks an abrupt departure from its previous application of the rule and that the

language of Rule 203 in its entirety clearly shows that Rules 203(a) and (b) apply concurrently with Rule 203(f). It is true that an administrative agency's construction of its own rules is generally considered to be persuasive and is afforded deference by the courts, but the courts will not be bound by an interpretation that is clearly erroneous, arbitrary or unreasonable. (See *Winnetkans Interested in Protecting the Environment v. Pollution Control Board* (1977), 55 Ill. App. 3d 475, 370 N.E.2d 1176; *Olin Corp. v. Pollution Control Board* (1977), 54 Ill. App. 3d 480, 370 N.E.2d 3.) Although the Agency cites decisions of the Board in support of its contention while U.S. Steel cites Board decisions in an effort to establish the contrary, it is not necessary for us to delve into the past practices of the Board, for we conclude that the language of Rule 203 in its entirety cannot support either U.S. Steel's position or the Board's interpretation.

Rule 101 defines an emission source as "any equipment or facility of a type capable of emitting specified air contaminants to the atmosphere." Rules 203(a) and (b) apply respectively to any new and existing process emission source, which according to definition found in Rule 201, is "any stationary emission source other than a fuel combustion emission source or an incinerator." The four blast furnaces thus are clearly subject to Rules 203(a) and (b) because they are stationary emission sources. Rule 203(c) pertains to compliance with Rules 203(a) and (b), while Rule 203(d) lists 10 specific exceptions to Rules 203(a), (b) and (c). Those exceptions are: (1) catalyst regenerators of fluidized catalytic converters; (2) sinter processes; (3) kilns and coolers of portland cement manufacturing processes; (4) feed and gluten dryers in corn wet milling processes; (5) grinding, woodworking, sandblasting and shotblasting industries; (6) coke manufacturing processes; (7) certain small foundry cupolas; (8) stock piles of particulate matter; (9) grain-handling and grain drying operations; and (10) certain iron-melting air furnaces located in Hoopeston, Vermilion County, Illinois. Nowhere in Rule 203(d) is there a mention of blast furnaces or cast house operations, which would indicate that the subject operations are not governed by Rules 203(a) or (b).

U.S. Steel relies solely on Rule 203(f), which sets separate standards for fugitive particulate matter which is defined in Rule 201 as follows:

> "Fugitive Particulate Matter: Any particulate matter emitted into the atmosphere other than through a stack, provided that nothing in this definition or in Rule 203(f) shall exempt any source from compliance with other provisions of Rule 203 otherwise applicable merely because of the absence of a stack."

However, the basis for U.S. Steel's claim of exclusive application of Rule 203(f) is the absence of a stack from the cast houses and the above definition states, without question, that that factor alone does not exempt

any source from compliance with other applicable rules. The cast houses being stationary emission sources that are not specifically exempted from Rules 203(a), (b) and (c) by Rule 203(d), they may not be exempted merely because their emissions are not vented through a stack. It is also worth noting that, of the exceptions found in Rule 203, only the grinding, woodworking, sandblasting and shotblasting industries and stockpiles are made subject to Rule 203(f). (Rule 203(d)(5) and (8).) Again, there is no mention of iron blast furnaces.

We conclude that Rule 201 provides that fugitive emissions shall also be subject to other applicable provisions of Rule 203. Because the cast house emissions here are subject also to Rules 203(a) and (b), and are not subject to any stated exception, they must comply with Rules 203(a) and (b). Therefore, even if we were to accept the Board's findings as to Rule 203(f), the record still shows that U.S. Steel did not establish its compliance with Rules 203(a) and (b). Accordingly, we hold that the Board's stated interpretation of Rules 203(a), (b) and (f) is clearly erroneous and that it was error to order the Agency to issue the permit.

For the foregoing reasons, the order of the Board finding U.S. Steel in compliance with Rule 203(f) and directing the Agency to issue the permits is reversed.

Reversed.

SULLIVAN, P. J., and WILSON, J., concur.