LAVERN CHASE, Plaintiff-Appellee and Cross-Appellant, v. THE DEPARTMENT OF PROFESSIONAL REGULATION et al., Defendants-Appellants and Cross-Appellees.

First District (2nd Division)  No. 1—91—0930

Opinion filed January 5, 1993.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and John A. Morrissey, Assistant Attorney General, of Chicago, of counsel), for appellants.

William C. Coughlin, of Chicago, for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

On December 29, 1988, the Illinois Department of Professional Regulation (Department) filed a two-count complaint against Lavern Chase, a licensed architect, charging him with violating the Illinois Architecture Act (Act) (Ill. Rev. Stat. 1987, ch. 111, par. 1201 *et seq.*).[1] Count I of the complaint alleged that Chase signed and sealed architectural plans and specifications for a fire station in Norwood Park, Illinois, which were not produced under his personal supervision, in violation of section 18(h) of the Act. Count II of the complaint charged Chase with aiding Louis Galante, a nonarchitect, to evade the Act by his signing and sealing plans drawn by Galante, in violation of section 18(g) of the Act.[2]

On April 6 and 7, 1989, hearings were held on the complaint before a nonarchitect hearing officer. Three members of the Architect

---

[1]The Illinois Architecture Act was repealed by the Illinois Architecture Practice Act of 1989, which became effective on December 31, 1989. See Ill. Rev. Stat. 1991, ch. 111, par. 1301 *et seq.*

[2]Sections 18(g) and (h) of the Act provide:
"The [Department] may refuse to issue, to renew, may suspend or may revoke any certificate of registration for any one or any combination of the following causes:
* * *
(g) aiding another person to evade the Act;
(h) signing, affixing his seal or permitting his seal to be affixed to any plans, specifications or drawings not prepared by the architect himself or under his personal direction or supervision." Ill. Rev. Stat. 1987, ch. 111, pars. 1218(g), (h).

Examining Committee (Committee) of the Department also attended and questioned the witnesses. The following evidence was adduced at the hearings. In the fall of 1986, Chief Rocco Olita of the Norwood Park fire department asked Galante to design a fire house, converting an existing structure for that purpose. Thereupon, Galante, who at the time was Chicago fire commissioner, examined the existing structure as well as the original drawings of the building submitted to him by Olita, and after taking some measurements on the building site, informed Olita that the project appeared to be feasible.

In late December 1986, Galante requested Chase to assist him in the endeavor. At that time, Chase was employed as an architect by the City of Des Plaines, and he also owned and operated Chase Associates, an architectural firm. Chase agreed to assist Galante with the project, and he also agreed to have Galante handle the negotiation of fees and cost estimates with Olita.

In January 1987, Galante advised Olita that his fee for drafting the fire station plans would be 3% of the first million dollars of the cost of construction and 1.5% of the cost in excess of $1 million. Chase and Galante agreed between themselves that Chase would receive $30 per hour for his services. Shortly thereafter, Norwood Park awarded a contract to Galante for his architectural services.

On February 12, 1987, Galante sent a letter to Olita which confirmed the fee for which he would furnish the necessary drawings and specifications. Although Chase's involvement in the project was nowhere mentioned in the letter, Galante did bill Norwood Park on Chase's stationery, albeit without Chase's knowledge. Olita and Chase both stated that they had never met each other, and Olita testified that based on Galante's representations, he thought that Galante was in fact the architect on the project and that he was a member of Chase Associates.

Galante drafted all of the plans for the fire station. Chase did not visit the fire station, nor did he know or consult with any of the mechanical or electrical contractors; he did, however, review many of the drafts which Galante drew. The record reflects that Galante spent about 100 hours drafting the plans and that Chase spent approximately 30 hours reviewing them. Chase signed and sealed the final plans, which were delivered to Norwood Park officials in July 1987.

Warner Sabo, called by Chase, and the only expert witness to testify at the hearing, stated that based on his conversations with Chase and Galante, as well as his review of the plans of the building, Chase's supervision of Galante was "adequate." He testified that Chase's failure to meet with the contractors on the site, while perhaps

"not good business practice," did not constitute inadequate supervision. He also stated that although he would not call the drawings "highly acceptable," they did fall within "an acceptable range." Sabo also testified that many architects in the field allow their draftsmen to negotiate fee arrangements with their clients.

On May, 10, 1989, the hearing officer issued a report to the Committee detailing his recommended findings of fact and conclusions of law. With respect to count I of the complaint, the hearing officer concluded that Chase violated section 18(h) of the Act by signing and sealing Galante's architectural plans without proper personal supervision and control. He first stated that he did not need to apply expert testimony to these facts in order to determine whether Chase's activities violated section 18(h) of the Act. He therefore gave little weight to Sabo's testimony. He further found that Chase relied too heavily on Galante's "expertise" as a draftsman and that he did not take enough of an active role in the design of the facility. He thus concluded that "[t]his project simply did not bear any fingerprints by [Chase] which can be said to constitute the hands-on direct supervisory control required."

Regarding count II of the complaint, the hearing officer concluded that Chase violated section 18(g) of the Act by aiding Galante to practice architecture without a license. He determined that Galante was in fact holding himself out as an architect, as evidenced primarily by his letter to Olita detailing the services that he would provide. It was the further observation of the hearing officer that section 18(g) does not require a specific intent to aid another in practicing architecture without a license. He reasoned that since other professional practice acts include the term "willful or willfully aiding" another to practice a regulated profession without a license, the legislature clearly did not require in section 18(g) of the Act that a specific intent to aid another in the practice of architecture be established. Finally, the hearing officer determined that Chase aided Galante in practicing architecture without a license in violation of section 18(g) because his lack of supervisory control over Galante's negotiations with Olita enhanced Galante's ability to successfully convince Olita that he was in fact the architect on the project. The hearing officer recommended that Chase be disciplined; however, he left the specific recommendation as to sanctions to the discretion of the Committee.

On May 12, 1989, the Committee issued its recommendation to the Director. It adopted the hearing officer's findings of fact and conclusions of law and supplemented them with its belief that Chase did not adequately supervise and control the project because it found sev-

eral deficiencies in the architectural plans, including violations of certain safety codes. The Committee further stated that Chase's lack of "intimate personal knowledge" of the project contributed to Galante's unauthorized practice of architecture. For these reasons, the Committee recommended to the Director: (1) that Chase's license be suspended for at least three years; (2) that Chase be required to engage in practical diversified training under a licensed architect for three years; and (3) that Chase be required to retake the Architect Registration Examination (ARE) prior to reinstatement.

On September 15, 1989, Stephen Selcke, who was Director of the Department at the time these proceedings were conducted, issued an order accepting the Committee's findings that Chase violated sections 18(g) and (h) of the Act. The Director also agreed that Chase's license should be suspended; however, he remanded the case to the Committee with respect to the other two proposed sanctions because he felt that the case did not involve Chase's competence as an architect. The Director also asked the Committee to consider shortening the period of suspension.

On November 13, 1989, the Committee issued a supplemental recommendation. It disagreed with the Director's opinion that this case did not concern competence, specifically noting what it perceived to be the deficiencies in the plans for the fire station. The Committee nevertheless modified the sanctions that it had originally recommended, suggesting that Chase's suspension and period of supervision should be decreased to two years and that he be required to retake only certain specified portions of the ARE. On April 13, 1990, Kevin Wright, the Director who had succeeded Selcke, issued an order adopting the Committee's revised recommended sanctions.

On May 16, 1990, Chase filed a complaint for administrative review in the circuit court pursuant to section 3—103 of the Administrative Review Act. (Ill. Rev. Stat. 1989, ch. 110, par. 3—103.) On February, 19, 1991, the court affirmed the Director's decision that Chase violated sections 18(g) and (h) of the Act and that his license be suspended for two years, holding that the evidence was sufficient to support that determination, and rejecting Chase's contention that expert testimony was necessary in order to determine whether his supervision of Galante was in fact inadequate. However, the court reversed the Director's sanctions that Chase obtain supervisory experience and retake parts of the ARE, reasoning that since the case had nothing to do with Chase's competence as an architect, those sanctions were arbitrary and capricious.

The Department appeals from the trial court's decision reversing the Director's sanctions with regard to supervision and retaking the ARE. Chase cross-appeals from the court's decision affirming the Director's finding of a violation of sections 18(g) and (h) of the Act and the two-year suspension of his license.

I

We first address Chase's cross-appeal. He initially asserts that the complaint failed to inform him of the nature of the alleged violations of the Act. He claims that the Committee continuously referred to the defects in the plans both at the hearing and in its recommendation to the Director, even though the complaint did not allege a violation of section 18(a) or (b) of the Act, which deal with incompetency.[3]

■■ Chase's claim is unfounded. In administrative proceedings, a complaint need not state the charges with the same refinements and selectivity as a complaint in a court of record. (*Grissom v. Board of Education of Buckley-Loda Community School District No. 8* (1979), 75 Ill. 2d 314, 323, 388 N.E.2d 398, 401; *Ballin Drugs, Inc. v. Department of Registration & Education* (1988), 166 Ill. App. 3d 520, 526, 519 N.E.2d 1151, 1156, *appeal denied* (1988), 121 Ill. 2d 567, 526 N.E.2d 827.) An administrative complaint need only " 'reasonably apprise the party of the case against him so that he will be able to intelligently prepare his defense.' [Citation.]" *Ballin*, 166 Ill. App. 3d at 526, 519 N.E.2d at 1156.

■■ In the case at bar, the complaint accuses Chase of violating section 18(h) of the Act for not adequately supervising Galante's drafting of the plans for the fire station. The complaint also charges that Chase violated section 18(g) of the Act by aiding Galante in practicing architecture without a license. A review of these allegations makes it clear that they gave Chase a sufficient opportunity to prepare an intelligent defense thereto.

Chase specifically asserts that he had no way of anticipating, based on the complaint, that the Department would make an issue of the quality of the plans, since it was irrelevant as to whether he properly supervised Galante. It is plain, however, that inadequacies in his draftsman's drawings are always pertinent to the question of whether an architect has sufficiently monitored his work in compliance with

---

[3]Section 18(a) of the Act allows the Department to suspend an architect's license for "gross incompetency." Section 18(b) of the Act permits the Department to suspend an architect's license for "recklessness in the performance of professional services." Ill. Rev. Stat. 1987, ch. 111, pars. 1218(a), (b).

the requirements of section 18(h) of the Act. Therefore, Chase should not have been surprised when, at the hearing, the Department questioned him regarding the details of Galante's drawings. Consequently, we find that the complaint adequately apprised Chase of the charges against him.

## II

Chase next contends that the Director's determination that he violated sections 18(g) and (h) was against the manifest weight of the evidence. Specifically, he claims that the Department presented no expert testimony from which the Committee could have concluded that he violated these sections of the Act; therefore, he asserts, the Committee members considered matters outside the record, *i.e.*, their own expertise, to find that he violated the Act.

The Department responds by asserting that it was not necessary that it offer any expert testimony because the Committee could rely on its own expertise to conclude that Chase violated the Act. In the alternative, it argues that the hearing officer and the trial court, both nonarchitects, determined that Chase violated the Act without the aid of expert testimony. The Department thus urges that even if it used its own special knowledge improperly, it was sufficient that it adopted the conclusions of the hearing officer, who did not employ any expertise in arriving at his conclusions.

As a general matter, the findings and conclusions of an administrative agency on questions of fact are deemed *prima facie* true and correct. (Ill. Rev. Stat. 1991, ch. 110, par. 3—110; *Carver v. Bond/ Fayette/Effingham Regional Board of School Trustees* (1992), 146 Ill. 2d 347, 355, 586 N.E.2d 1273, 1277.) A reviewing court may not disturb these findings unless they are against the manifest weight of the evidence. (*Kloss v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 252, 257, 449 N.E.2d 845, 848.) This rule, however, does not relieve a reviewing court of its duty to examine the evidence in an impartial manner and to set aside an order which is unsupported in fact. *Carver*, 146 Ill. 2d at 355, 586 N.E.2d at 1277; *Kloss*, 96 Ill. 2d at 258, 449 N.E.2d at 848.

■ Although, as noted above, the standard of review of an administrative finding of fact generally is whether it is against the manifest weight of the evidence, where an administrative agency makes factual determinations involving technical concepts unique to its expertise, expert testimony must be introduced *into the record* supporting the agency's position. (*Smith v. Department of Registration & Education* (1952), 412 Ill. 332, 106 N.E.2d 722; *Farney v. Anderson*

(1978), 56 Ill. App. 3d 677, 372 N.E.2d 151; see also *Craig v. Pollution Control Board* (1978), 59 Ill. App. 3d 65, 376 N.E.2d 1021.) In *Smith*, the trial court upheld the Director's decision to suspend the plaintiff's license to practice medicine, even though the Department of Registration and Education, the predecessor agency of the present Department of Professional Regulation, introduced no expert testimony, on the ground that members of the medical board did not need expert evidence to arrive at their decision given the knowledge, experience and expertise of its members. *Smith*, 412 Ill. at 347, 106 N.E.2d at 729.

■ Our supreme court reversed. The court stated that "[i]t is well settled *** that an administrative tribunal cannot rely upon its own information for support of its findings." (*Smith*, 412 Ill. at 347, 106 N.E.2d at 730.) Instead, it stated that an agency's findings must be based on evidence " '*appearing in the record*,' " so that each party may have an opportunity to cross-examine witnesses, inspect documents, and to introduce contrary testimony. (*Smith*, 412 Ill. at 349, 106 N.E.2d at 730, quoting *McKay v. State Board of Medical Examiners* (1938), 103 Colo. 305, 312, 86 P.2d 232, 236.) The court reasoned:

> "Attorneys for [the Department] contend that there was no necessity for such proof inasmuch as appellant himself stated from time to time *** that the American Medical Association had no use for the treatment and regarded it as worthless and not to go to any other doctor because other doctors would not co-operate in its administration. This argument is without much force. As we have indicated heretofore, the revocation of a professional license involves serious consequences, both to the licensee under attack and to the public. The charges must be specific and the proof clear and convincing. If Dr. Smith is dishonest in his practice and if the 'Koch Treatment' is without value, it was a simple matter for the Department to have produced *such proof*. This court possesses neither medical learning nor powers of telepathy. We are, therefore, unable to medically evaluate the *testimony in this record* or to know what scientific appraisal of it was made by the medical committee." (Emphasis added.) *Smith*, 412 Ill. at 349, 106 N.E.2d at 731.

We clarified this principle in *Farney* (56 Ill. App. 3d 677, 372 N.E.2d 151), where a hearing was conducted before the Illinois State Medical Disciplinary Board, which consisted of a panel of three doctors. After the board found that the plaintiff had dispensed certain controlled substances without a legitimate medical

reason, it recommended that his license to practice medicine be suspended for six months, and the Department approved this recommendation. (*Farney*, 56 Ill. App. 3d at 679, 372 N.E.2d at 152.) The trial court reversed, finding that because the plaintiff presented the only expert testimony at the hearing, there was no evidence to support the Department's determination. *Farney*, 56 Ill. App. 3d at 679, 372 N.E.2d at 152.

The appellate court affirmed. The court, after stating that the case before it "leads to [the] broader question [of] the nature of evidence before an administrative tribunal and the manner in which a reviewing court should deal with it" (*Farney*, 56 Ill. App. 3d at 679, 372 N.E.2d at 152), categorically rejected the Department's contention that there was no need to present expert testimony to support its case. (*Farney*, 56 Ill. App. 3d at 681, 372 N.E.2d at 153.) After discussing *Smith* and acknowledging its applicability, the court stated:

> "The underlying, but perhaps unspoken, reason for requiring expert [testimony] by the Department is the existence of judicial review of the Decisions of the Medical Disciplinary Board ***. While it may seem idle and foolish to a board composed of physicians to present elementary questions of medicine to them by way of testimony of one of their own brethren, yet it is far from idle to a court, not trained in medicine, which is called upon to determine the manifest weight of the evidence. [Citation.] To hypothesize: Let [*sic*] suppose that a single physician were called upon to review a record of the Attorney Registration and Disciplinary Commission. What might appear patent to the Commission could likewise be delphically obfuscating to the physician. To determine manifest weight of evidence in an area not of one's own training and education becomes a difficult task at best, and it becomes impossible when only one pan of the scales is filled. ***
>
> *** The method employed by Farney might be the accepted one for treating addicts; perhaps not, but it is not for a layman, uneducated in medicine, to say. *Expert testimony, whether coming down on the positive or negative side of Farney's treatment, is essential. We reiterate that the only medical testimony in the record is that of Farney, and while it might be called self-serving and thus suspicious, it is not offset by any other expert opinion.*
> ***

We therefore conclude that the substitution of subjective analysis on the part of the medical panel in place of expert medical opinion fatally tainted the proceedings." (Emphasis added.) *Farney*, 56 Ill. App. 3d at 682-83, 372 N.E.2d at 154.

The rule that we glean from *Smith* and *Farney* is that although an administrative agency may use its expertise to evaluate conflicting expert testimony *introduced into the record*, it cannot substitute that special knowledge for expert testimony in support of its position.[4] The rationale for this rule is twofold. First, where the agency substitutes its own expertise *dehors* the record for expert testimony, the other party is patently deprived of its right to challenge that evidence through cross-examination. Second, reviewing courts, almost invariably nonexperts in the particular field they have under consideration, have no reliable way of determining whether an agency's decision is against the manifest weight of the evidence since expert testimony supporting its conclusion is not in the record.

■ In the case at bar, the Department concedes that it called no expert witnesses during the administrative hearing. It nevertheless argues that it could rely on its own expertise to determine that Chase violated sections 18(g) and (h) of the Act. We cannot accept such a result in light of *Smith* and *Farney*. Chase did not have the opportunity to cross-examine the Committee in order to discover the basis upon which it concluded that he had violated the Act. More specifically, Chase had no opportunity to question the board members as to why they felt that the plans included safety violations and why they believed that 30 hours of supervision were insufficient. Accordingly, we hold that the board was not entitled to rely on its own expertise in finding that Chase violated the Act.

In the alternative, the Department asserts that based on the facts of this case, it did not need to introduce expert testimony into the record in order to establish that Chase contravened the Act. We disagree. This case involves technical concepts, and it is impossible for us, as laymen *vis-a-vis* architecture, to determine from this record whether Chase violated the Act. As noted previously, the only expert to testify at the hearing stated that the plans were adequate, that 30 hours were a sufficient amount of supervision, and that it was not unusual for an architect to allow his draftsman to negotiate with a potential client. Since we lack the architectural optic, we have no way of

---

[4]Although an administrative agency may take judicial notice of certain facts, the parties must be notified of such a procedure so that they may contest the material being judicially noticed. See Ill. Rev. Stat. 1987, ch. 127, par. 1012(c).

determining how or why the Department disregarded this testimony and concluded that Chase violated the Act in light of the fact that such testimony was unrebutted, undenied, unexplained, and uncontroverted by the Department, nor did it make any attempt to do so.

For all of the foregoing reasons, we reverse the trial court's judgment affirming the Director's determination that Chase violated sections 18(g) and (h) of the Act, since the Director's decision was against the manifest weight of the evidence. Furthermore, since we hold that the Director's determination that Chase violated the Act was against the manifest weight of the evidence, we affirm the trial court's order reversing the Director's other sanctions against Chase.

Affirmed in part; reversed in part.

McCORMICK, P.J., and HARTMAN, J., concur.