(No. 54131.—

THE ENVIRONMENTAL PROTECTION AGENCY, Appellee, v. THE POLLUTION CONTROL BOARD *et al.* (United States Steel Corporation, Appellant).

*Opinion filed September 30, 1981.*

Clifton A. Lake and Johnnine Brown Hazard, of Rooks, Pitts, Fullagar & Poust, of Chicago, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield (Thomas R. Chiola and Judith S. Goodie, Assistant Attorneys General, of Chicago, of counsel), for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

U.S. Steel Corporation (the company) applied to the Illinois Environmental Protection Agency (the Agency) for operating permits for four blast furnaces located at its "South Works" in Chicago. The company sought review (Ill. Rev. Stat. 1977, ch. 111½, par. 1040) by the Pollution Control Board of the Agency's denial, and the Board ordered the Agency to grant the permits. The Agency appealed to the appellate court (73 Ill. 2d R. 335), which reversed the Board (88 Ill. App. 3d 71), and we granted the company's petition for leave to appeal.

This case involves the Board's construction of Rule 203 of its rules and regulations (Illinois Pollution Control Board Rules and Regulations, Chapter 2: Air Pollution (1970) (the Rules)), which states, in part:

"Rule 203: Particulate Emission Standards and Limitations.

(a) <u>Particulate Emission Standards and Limitations for New Process Emission Sources.</u>

Except as further provided in this Rule 203, no person shall cause or allow the emission of particulate matter into the atmosphere in any one hour period from any new process emission source which, either alone or in combination with the emission of particulate matter from all other similar new process emission sources at a plant or premises, exceeds the allowable

emission rates specified in Table 2.1 and in Figure 2.1.

* * *

(b) Particulate Emission Standards and Limitations for Existing Process Emission Sources.

Except as further provided in this Rule 203, no person shall cause or allow the emission of particulate matter into the atmosphere in any one hour period from any existing process emission source which, either alone or in combination with the emission of particulate matter from all other similar new or existing process emission sources at a plant or premises, exceeds the allowable emission rates specified in Table 2.2 and in Figure 2.2.

* * *

(d) Exceptions to Rules 203(a), 203(b) and 203(c).

[The exceptions here specified involve a number of particularly described operations to which different standards or different sections are to be applied. Blast furnaces and casting operations are not included.]

* * *

(f) Fugitive Particulate Matter.

(1) No person shall cause or allow the emission of fugitive particulate matter from any process, including any material handling or storage activity, that is visible by an observer looking generally toward the zenith at a point beyond the property line of the emission source.

(2) No person shall cause or allow the emission of fugitive particulate matter from any process, including any material handling or storage activity, in such a manner that the presence of such particulate matter shown to be larger than forty (40) microns (mean diameter) in size exists beyond the property line of the emission source."

Rule 201 contains the following definitions:

"Fugitive Particulate Matter: Any particulate matter emitted into the atmosphere other than through a

stack, provided that nothing in this definition or in Rule 203(f) shall exempt any source from compliance with other provisions of Rule 203 otherwise applicable merely because of the absence of a stack.

Process: Any stationary emission source other than a fuel combustion emission source or an incinerator.

Stationary Emission Source: An emission source which is not self-propelled."

Also relevant to our consideration is section 39 of the Environmental Protection Act (the Act), which provides:

"(a) When the Board has by regulation required a permit for the *** operation of any type of facility ***, the applicant shall apply to the Agency for such permit and it shall be the duty of the Agency to issue such a permit upon proof by the applicant that the facility *** will not cause a violation of this Act or of regulations hereunder. *** If the Agency denies any permit under this Section, the Agency shall transmit to the applicant within the time limitations of this Section specific, detailed statements as to the reasons the permit application was denied. Such statements shall include, but not be limited to the following:

(i) the sections of this Act which may be violated if the permit were granted;

(ii) the provision of the regulations, promulgated under this Act, which may be violated if the permit were granted;

(iii) the specific type of information, if any, which the Agency deems the applicant did not provide the Agency, and;

(iv) a statement of specific reasons why the Act and the regulations might not be met if the permit were granted.

If there is no final action by the Agency within 90 days after the filing of the application for permit, the applicant may deem the permit issued." Ill. Rev. Stat. 1977, ch. 111½, par. 1039.

The Agency's denial of the permits was by letter,

stating:

> "As required by Section 39 of the Illinois Environmental Protection Act, specific reasons why the Rules and Regulations might not be met follow:
>
> > The #8, #10, #11, and #12 blast furnaces emit particulate matter, by our analyses, in excess of that amount allowed by Rule 203(a). Therefore no permit may be granted."

The letter stated no other reason for the denial. The company, in a letter to the Agency, protested that decision, stating:

> "In response to your denial of an operating permit for the subject facilities, we take exception to the interpretation of the regulations regarding fugitive emissions.
>
> * * *
>
> To our knowledge no basic iron blast furnace cast house in the United States is vented through a stack. It is therefore clear that cast emissions are fugitive emissions and should not be included in determining compliance with process weight limitation."

The Agency replied by letter, again denying the permit for reasons identical to the original denial.

The company petitioned the Board, pursuant to section 40 of the Act, claiming that the Agency had improperly applied Rule 203(a) to emissions governed by, and in compliance with, Rule 203(f). Section 40 states in part:

> "If the Agency refuses to grant a permit under Section 39 of this Act, the applicant may petition for a hearing before the Board to contest the decision of the Agency. * * * The Agency shall appear as respondent in such hearing. At such hearing the rules prescribed in Sections 32 and 33(a) of this Act shall apply, and the burden of proof shall be on the petitioner." Ill. Rev. Stat. 1977, ch. 111½, par. 1040.

Before the Board, the company and Agency stipulated to a description of the casting-house operation which in-

cluded:

"During the casting operation, particulate matter is unavoidably released upon contact between the molten iron and the air. Such particulate matter is not controlled by Petitioner, nor are particulate controls for molten iron casting operations in connection with basic iron blast furnace operations employed by any other operator within the State of Illinois."

The stipulation also outlined the origin of the dispute between the Agency and the company:

"Although cast house emissions have always existed, the Agency had no knowledge until 1977 of what those cast house emissions were. *** In 1977 the U.S. Environmental Protection Agency found in its report covering cast house emissions, which the Illinois Agency took notice of in this case, that cast houses have an emission factor of .3 pounds per ton of metal tapped. Beginning in 1977 the Illinois Environmental Protection Agency has taken cast house emissions into consideration in each basic iron blast furnace and will require controls on the particulate emissions generated during casting when such cast house emissions result in a violation of Rule 203 of Chapter II of the Illinois Pollution Control Board Rules and Regulations: Air Pollution."

Although the company had before the Board disputed the manner of calculation of one hour's emissions, it is apparently now conceded that emissions from each of the four furnaces would, during an hour of tapping, exceed emissions permissible under Rules 203(a) and (b), if those rules apply and if estimated casting-house emissions are included. The controversy between the company and Agency resolves itself into whether casting-house emissions must be included, at Agency-estimated levels, in calculations under Rules 203(a) and (b) as well as being subject to the limitations of Rule 203(f), compliance with which the Agency did not deny in ruling on the permit. The Board's decision ordering the Agency to issue the permits stated:

"On August 7, 1978 the parties herein filed a Stipulation of Fact before the Board. Review of the Stipulation shows that there is no issue of fact in this case but rather a question of interpretation of the Board's regulations. The facilities in question are four blast furnaces used by USS for the purpose of producing molten iron to be used in the company's steel making process. The emissions in question are produced only during the tapping of molten iron into ladle cars which transport the iron to the steel-making furnaces. These emissions occur in what is known as the cast house and escape to the atmosphere by way of roof monitors, doors, and other openings in the building. The Agency contends that USS has failed to demonstrate compliance with Rule 203(a) of Chapter 2 of the Board's Air Pollution Control Regulations. USS on the other hand contends that its casting emissions are fugitive emissions and are therefore governed by Rule 203(f) rather than the process weight limitations of Rule 203(a) or (b) and that the blast furnace casting emissions comply with the requirements of said Rule 203(f).

\* \* \*

It is, of course, clear that the mere determination of an emission factor for a process does not suddenly change the nature of the emissions from that process from fugitive emissions to stack emissions, etc. Whether or not emissions are fugitive in nature is determined by their physical characteristics, not by whether someone has been able to estimate an emission factor for them. Rule 203(f) appears to the Board to be very straight forward. It sets a separate standard for fugitive-type emissions but includes a proviso that says, in effect, if the emissions can be readily collected and treated, they shall fall under 203(a) and (b) regardless of whether they are not presently thus collected or whether it is industry's practice to thus collect them. In this case there is an unfortunate lack of information concerning the conditions surrounding the casting op-

eration. It is within the Board's knowledge that a casting operation could entail everything from a short tapping operation into a ladle which might easily be controlled all the way to a very widespread operation containing literally acres of area which would indeed result in fugitive-type emissions.

Utilizing what information is before us in this case, the Board finds that the mere presence of an emission factor in one operation does not in and of itself provide the Agency with enough evidence to deny the USS permit application in this case. The only information before the Board at this time indicates that the casting operation at the blast furnace facility results in a fugitive-type emission of particulate matter which should be governed by Section 203(f) of the Regulations. The Board finds that the Agency erred in its denial of the USS permit application for its blast furnaces and will, therefore, order a permit to issue pursuant to said permit application."

The Board denied the Agency's petition for rehearing, stating:

"In support of its Motion, the Agency argues that in a permit appeal the burden is on the Petitioner to prove, based upon its application, that its emissions will not cause a violation of the Act or Regulations and that the Board failed to find that. U.S. Steel met its burden of proof. Furthermore, the Agency argues that the Board failed to find that, even if U.S. Steel's cast house emissions are fugitive in nature, Rules 203(a) and (b) do not apply.

The intent of our Opinion was to interpret Rules 203(a) and (b) and 203(f), as well as the Rule 201 definition of 'Fugitive Particulate Matter,' to mean, when read together, that Rules 203(a) and (b) do not apply to fugitive emissions. Such emissions are regulated by Rule 203(f). Our interpretation of the definition of fugitive emissions is that emissions which cannot be readily collected and treated are fugitive in nature.

*** U.S. Steel had the burden of proving, based upon its application, that its emissions are fugitive in nature and that they do not violate the Act or Regulations. The Board found that, although casting emissions can vary widely as to collectibility, the only information before the Board indicated that emissions from the casting operation at U.S. Steel's blast furnace facility are not readily collectible and are thus fugitive in nature. That conclusion was based upon information in U.S. Steel's application and the explanation of that information in the Stipulation of Facts and Petitioner's Brief. That same information indicates that U.S. Steel's casting operation does not violate Rule 203(f). The Agency presented no evidence to rebut the information in the record indicating that the emissions are fugitive emissions and that they do not violate Rule 203(f). The Board, therefore, found in effect that U.S. Steel had met its burden of proof. The Board notes that its finding that the casting emissions in question are fugitive in nature applies only to U.S. Steel's casting operations as portrayed in the record of this case and not to all cast house emissions."

In *Landfill, Inc. v. Pollution Control Board* (1978), 74 Ill. 2d 541, 554, we recognized that the Board has both quasi-legislative and quasi-judicial functions, stating:

"The Board, which was created by the Act (Ill. Rev. Stat. 1975, ch. 111½, par. 1005(a)), serves both quasi-legislative and quasi-judicial functions within a statutorily established framework. It must determine, define, and implement the environmental control standards and may adopt rules and regulations (Ill. Rev. Stat. 1975, ch. 111½, pars. 1005(b), 1026, 1027). It has authority to conduct hearings upon, among other specified matters, complaints charging violations of the Act or of regulations thereunder and upon petitions for review of the Agency's denial of a permit as well as authority to hold other such hearings as may be provided by rule (Ill. Rev. Stat. 1975, ch. 111½, par. 1005(d))."

Although the present case involved an appeal from the denial of a permit, it presented the Board with a question of defining the scope of the emission standards. Webster's Third New International Dictionary, at page 616 (1971), gives as one definition of "determine," "to set bounds or limits to: as a: to fix the boundaries of b: to limit in extent or scope." One of the meanings given by that dictionary for "define" is, "to mark the limits of: determine with precision or exhibit clearly the boundaries of." (Webster's Third New International Dictionary 592 (1971).) We believe that this function of defining the scope of the emission standards is a quasi-legislative act. On the other hand, the Board's decision whether the emissions from the company's casting operations were "collectible" was in the nature of a judicial act.

We dealt with a similar situation in *Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276. In that case, conditions imposed by the Board on the grant of a variance to an individual company were judged against the standard applicable to quasi-legislative acts. We likened the conditions to a rule, operating prospectively, even though they were based on specific facts concerning one company. This court stated:

"In *Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, this court reviewed certain noise pollution regulations of the Board, and upheld them because they were not clearly arbitrary, unreasonable, or capricious. In dealing with those board regulations we said 'that administrative action taken under statutory authority will not be set aside unless it has been clearly arbitrary, unreasonable' or capricious.' (59 Ill. 2d 305, 310.) We see no reason to depart from this holding when dealing with individual interim discharge standards set by the Board, rather than with statewide regulations.
＊＊＊
＊＊＊ The setting of conditions, unlike the decision to grant a variance, is not quasi-judicial in nature, but

rather is one manifestation of the power granted the Board to act as the policy-making body. Section 36 of the Act is a rather broad delegation to the Board of power to impose whatever conditions are necessary to effectuate as nearly as possible the policies of the Act when a variance from statewide standards is granted. It is, in a word, rule-making power, in the sense that its focus is on future conduct and its efficacy depends upon agency expertise. 'Judicial judgment should not be substituted for administrative judgment on questions within the agency's statutory power of rule making.' [Citation.] The Board, unlike this court, is well equipped to determine the degree of danger which a pollutant will cause, and then to balance that public threat against an alleged individual hardship and reach a conclusion as to what limits should be placed upon a temporary variance. The power granted to the Board by section 36 is tantamount to the quasi-legislative power to make prospective regulations and orders. [Citation.] When a regulation is promulgated by an agency pursuant to a grant of legislative power, a reviewing court should not substitute its judgment as to the content of the regulation, because the legislature has placed the power to create such regulations in the agency and not in the court. [Citation.] Since in setting interim discharge standards the Board is, in effect, making future policy pursuant to the legislative delegation of section 36(a), we must be just as circumspect about interfering with the Board's discretion in establishing variance conditions as we are in dealing with the enactment of regulations. In summary, then, the proper scope of review of conditions limiting a variance is the same as that applied to board regulations in *Illinois Coal Operators Association*: whether the Board's action was arbitrary, unreasonable, or capricious." *Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 289-91.

Our cases clearly indicate that the Board's quasi-legislative acts are to be upheld on review unless they are

"clearly arbitrary, unreasonable or capricious" (*Rockford Drop Forge Co. v. Pollution Control Board* (1980), 79 Ill. 2d 271, 278; *Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305), while its quasi-judicial acts are to be upheld unless they are "contrary to the manifest weight of the evidence" (*Wells Manufacturing Co. v. Pollution Control Board* (1978), 73 Ill. 2d 226, 234; *City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482). These differing standards of review should be applied to the Board's acts in a single case, if those involved both quasi-legislative and quasi-judicial functions. See *Taylor v. Police Board* (1978), 62 Ill. App. 3d 486; *Modine Manufacturing Co. v. Pollution Control Board* (1976), 40 Ill. App. 3d 498.

In the present case it is urged that there was not sufficient information in the record to sustain the Board's decision. This argument is more relevant to the Board's finding of noncollectibility, to which the manifest weight of the evidence standard is applicable. Actually, we believe there was ample information in the record supporting the Board's reading of Rules 201 and 203, which appears to us to be a good synthesis of somewhat ambiguous rules rather than an erroneous reading of those rules. It was supported by discussion in the Board statement promulgating the air pollution rules, including the emission standards:

"No one disputed the elimination of special provisions for open hearths or for blast furnaces. * * * As for blast furnaces, very efficient gas cleaning is practiced to enable the steel companies to utilize the valuable gas, which contains much carbon monoxide, for heating purposes. As Reddy testified, 'blast furnace gas cleaning systems normally reduce particulate loading to less than 0.01 grain per standard cubic foot to prevent fouling of the stoves where the gas is burned.' Such a grain loading, he concluded, would suffice to bring emissions from blast furnaces with process rates from 5 to 500 tons per hour into compliance with Rule

203(a)."
(*In re Emission Standards* (1972), 4 Ill. P.C.B. Op. 298, 315.) This discussion, limited to "blast furnace gas" emissions, implies that the Board did not intend, in adopting Rules 203(a) and (b) emission standards, to apply those standards to blast furnace emissions related to the casting process, as opposed to "blast furnace gas," which is apparently vented through a stack. The Board's analysis was perhaps the most reasonable reading of the proviso of the Rule 201 definition of "fugitive particulate matter":

"provided that nothing in this definition or in Rule 203(f) shall exempt any source from compliance with other provisions of Rule 203 otherwise applicable merely because of the absence of a stack."

That definition seems somewhat circular at first reading. The Board's view, making the definition turn on "collectibility," seems to go to the heart of whether emissions are properly vented through a stack, and hence not truly "fugitive." Even if we assume that two readings of an ambiguous provision of an administrative regulation are both reasonable, the Board's choice must be respected, particularly where it formulated and promulgated the rule. Nor does the fact that Rule 203(d) makes specific and explicit exceptions to Rule 203 for certain processes, not including casting operations, require a different interpretation in view of the specific provisions of Rule 203(f). It is the more explicit provision, and should govern over the more general provisions of Rules 203(a) and (b), applying to all stationary emission sources except fuel-combustion emission sources and incinerators. The Board's reading parallels our rule of statutory construction, that a more specific or particular provision prevails over the more general. See *People ex rel. Fore v. Missouri Pacific R.R. Co.* (1930), 342 Ill. 226; *Natural Products Co. v. County of Du Page* (1924), 314 Ill. 74.

With respect to applying the collectibility standard to

the company's fact situation, the Board stated:

> "It is within the Board's knowledge that a casting operation could entail everything from a short tapping operation into a ladle which might easily be controlled all the way to a very widespread operation containing literally acres of area which would indeed result in fugitive-type emissions."

From information before the Board concerning the company's casting operation, including approximately 11 pages of statistics in each of the four applications, it was apparent that the company's casting operation, involving four large-capacity furnaces and ladle cars was not a "short tapping operation" which could be controlled. The stipulation stated that the emissions reached the atmosphere by means of a roof monitor, and through doors and other openings in the cast house. The particulate matter was "unavoidably" released upon contact of the molten iron and the air. A letter from the company to the Agency stated that there were not at that time any operating facilities within the United States for collecting such emissions. While the Board indicated that industry practice was not dispositive (lest adoption of low practice by an industry become a loophole in the environmental standards), the absence of even one example of the collection of such particulate emissions by stacks tends to support the Board's conclusion concerning collectibility. Since there was adequate supporting evidence and no substantial contrary evidence, the Board's finding that the company's cast-house emissions were not collectible was not contrary to the manifest weight of the evidence. It is, of course, entirely possible that technological advances have now resolved or will in the future resolve the collectibility problem, in which event we assume appropriate rules will be adopted.

The Agency also complains that the Board shifted the burden of proof concerning whether the company's facilities were complying with Rule 203(f) from the company to the Agency. This objection is without merit. There was

adequate information in the applications to show that the company was not in violation of the provisions of Rule 203(f). We do not believe, however, that the issue of compliance with Rule 203(f) was even before the Board. Section 39 of the Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1039) requires that the Agency state reasons for denial of a permit: "If the Agency denies any permit under this Section, the Agency shall transmit to the applicant within the time limitations of this Section [90 days] specific, detailed statements as to the reasons the permit application was denied," including "(ii) the provision of the regulations, promulgated under this Act, which may be violated if the permit were granted" (Ill. Rev. Stat. 1977, ch. 111½, par. 1039). The Agency's letters did not specify any violation of Rule 203(f). Although section 40 of the Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1040) provides that, on review of a permit denial, "the burden of proof shall be on the petitioner," it also states that "[t]he Agency shall appear as respondent in such hearing." In *Oscar Mayer & Co. v. Environmental Protection Agency* (1978), 30 Ill. P.C.B. Op. 397, 399, the Board stated:

"[I]n a Section 40 proceeding the Agency must file within 14 days of notice, the entire record of the permit application, including the application, correspondence, and the denial. The application is necessary to establish the facts which were before the Agency for consideration. The correspondence file, if any, supplements the application insofar as it provides additional facts. The denial statement is necessary to verify that the requirement of Section 39(a) of the Act has been fulfilled. This material, in the opinion of the Board, should be sufficient to frame the issue of fact or law in controversy in any hearing on a Section 40 petition."

We believe that the Agency had a duty, reading sections 39 and 40 of the Act together, to specify reasons for the denial, including, if it intended to raise the issue before the Board, the lack of compliance with Rule 203(f), or be precluded from raising that issue. In our judgment the sole dispute

before the Board was whether Rules 203(a) and (b) applied to emissions which were subject to and in compliance with the provisions of Rule 203(f). Since we have decided that the Board's refusal to apply Rules 203(a) and (b) to "fugitive particulate emissions" was reasonable, and that its finding that the company's cast-house emissions were not collectible and thus were "fugitive particulate emissions" was not contrary to the manifest weight of the evidence, it follows that the appellate court erred in reversing the Board.

Accordingly, the judgment of the appellate court is reversed, and the order of the Pollution Control Board is affirmed.

*Judgment reversed;*
*order affirmed.*