(Nos. 59473, 59480 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. THE POLLUTION CONTROL BOARD (The Environmental Protection Agency *et al.*, Appellants).

*Opinion filed October 3, 1984.*

David L. Rieser and E. William Hutton, Special Assistant Attorneys General, of Springfield, for appellant Environmental Protection Agency.

Michael J. Wilson, of Bloomington (Chesley and Wilson, of counsel), for appellant Bloomington and Normal Sanitary District.

James Murray, of Chicago, for appellant Metropolitan

Sanitary District of Greater Chicago.

Neil F. Hartigan, Attorney General, of Springfield (Russell R. Eggert and H. Alfred Ryan, Assistant Attorneys General, of Chicago, of counsel), for the People.

PER CURIAM: At issue in this consolidated appeal is the validity of revisions in State water-pollution regulations which govern levels of bacteria in what may be generally described as recreational waters. Drinking, or potable, water-quality standards are controlled by other regulations not before us.

The Illinois Environmental Protection Agency (the Agency) proposed the repeal of two water-quality standards governing maximum levels of bacteria in ambient waters (35 Ill. Adm. Code secs. 302.209, 302.406) and the amendment of the bacterial (liquid waste) effluent standard (35 Ill. Adm. Code sec. 304.121). Following the Agency's presentation of its proposal to the Illinois Pollution Control Board (the Board), the receipt by the Board of public comments and an economic impact statement as required by section 27 of the Environmental Protection Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1027), and a lengthy series of public hearings, the Board, with its chairman dissenting, adopted the Agency proposal. The Attorney General sought review of the Board's action in the appellate court pursuant to section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1981, ch. 111½, par. 1041), and that court reversed in part and affirmed in part (119 Ill. App. 3d 561). We granted the Agency's petition for leave to appeal. 87 Ill. 2d R. 315(a).

Only one of the two repealed water-quality standards, section 302.209, governing general-use waters, is involved in this appeal since the appellate court affirmed that part of the Board's order which adopted the Agency

recommendation to repeal section 302.406, relating to certain other waters, and that affirmance has not been challenged here. Section 302.209 provided:

> "Based on a minimum of five samples taken over not more than a 30-day period, fecal coliform *** shall not exceed a geometric mean of 200 per 100 ml, nor shall more than 10% of the samples during any 30-day period, exceed 400 per 100 ml." (35 Ill. Adm. Code, sec. 302.209.)

Under the regulations this standard is intended to govern all general-use waters, which is the term used to describe all State waters except those which receive effluent from Chicago Metropolitan Sanitary District plants. (See 35 Ill. Adm. Code, secs. 302.201, 303.441.) Water-quality standards promulgated for general-use waters exist to protect "aquatic life, agricultural use, *primary* and secondary contact use and most industrial uses and [to] ensure the aesthetic quality of the State's aquatic environment." (Emphasis added.) (35 Ill. Adm. Code, sec. 302.202.) Primary contact is defined as "[a]ny recreational or other use in which there is prolonged and intimate contact with the water involving considerable risk of ingesting water in quantities sufficient to pose a significant health hazard, such as swimming and water skiing." 35 Ill. Adm. Code, sec. 301.355.

Before section 302.209 was repealed, fecal coliform (a type of mostly benign bacteria found in the feces of warm-blooded animals) were used, *inter alia*, to determine whether water was suitable for primary contact. Their presence in water has long been recognized by the scientific community as an indication of the presence of pathogens—organisms which cause disease, including such waterborne diseases as typhoid, dysentery, cholera, and gastroenteritis. That fecal coliform exist in a water sample does not establish with absolute certainty that pathogens are present, but indicates the probability of

their existence. Even nonpathogenic species of fecal coliform may prove harmful since some strains have become drug-resistant and may transfer this quality to other pathogenic bacteria. The Agency found, and the Board agreed, that the fecal-coliform standard was an unreliable indicator and therefore not an appropriate measure of water quality, but neither the Agency proposal nor the Board's final rule contained a substitute microbiological indicator for waterborne pathogens. Thus, when section 302.209 was repealed, there existed no bacterial water-quality standard, although other standards, such as those governing radioactivity and chemical constituent maximums, remained in effect. See 35 Ill. Adm. Code, secs. 302.203 through 302.212.

The Board also approved the Agency's proposal to amend its bacterial-effluent standard, section 304.121 (35 Ill. Adm. Code, sec. 304.121). Prior to amendment, this standard prohibited all treatment plants from discharging effluent which exceeded 400 fecal coliform per 100 milliliters. The regulation, as amended, provided:

"No person shall cause or allow fecal coliform *** to exceed 400 per 100 ml in any effluent which discharges to the following locations:

(a) During the months of May through September, within 20 stream miles (statute miles) upstream of a public bathing beach licensed under the 'Illinois Swimming Pool and Bathing Beach Act' (Ill. Rev. Stat. 1979, ch. 111½, pars. 1201-1227).

(b) Within 20 stream miles (statute miles) upstream of a water intake used for public or food processing water supply.

(c) Any location where it may cause or contribute to violation of another state's water quality standards in interstate waters." (35 Ill. Adm. Code, sec. 304.121.)

It is clear from the record before us that the principal motive prompting the amended regulatory scheme was the termination or minimization of the expensive dis-

charge-chlorinating process used to treat sewage and waste water wherever such termination or reduction could be accomplished without jeopardizing the public health. The chlorination process itself, although used by 90% of Illinois treatment plants, is not without potential health risks, and it probably does not kill all pathogenic material. The amended standards are designed to obviate the need for continued chlorination by substituting 20-mile buffer zones affording protection to recreational users at licensed beaches, to potable and food-processing water supplies, and for interstate waters. Our review is, of course, limited to the validity of the means chosen to effect this policy change.

As has been previously stated, the appellate court affirmed the Board's decision to repeal one of the water-quality standards, former section 302.406 (35 Ill. Adm. Code, sec. 302.406), which contained a fecal-coliform criterion for secondary-contact waters (see 35 Ill. Adm. Code, sec. 301.380). The court reversed the repeal of section 302.209 on the grounds that the Board exceeded its statutory authority in deleting this regulation without replacing it with another microbiological indicator of pathogens. In striking the amended effluent standard, the court held that the Board's new rule was arbitrary and capricious since the 20-mile buffer zone it incorporated was without any scientific justification.

Before reaching the merits of this appeal, we should consider a motion by the Attorney General to supplement the record, which has been taken with the case. He seeks to augment the record with two documents: a letter from a United States Environmental Protection Agency (EPA) assistant administrator for water, which expresses the author's disapproval of the repeal of the water-quality standard, and a Federal Register notice requesting public comment on new microbiological water-quality criteria. The text of the motion refers to both

documents as "authority." The letter, while it may bear upon whether the United States EPA would give final approval to the repeal of sections 302.209 and 302.406 (see 33 U.S.C. sec. 1313(c) (1976)), does not constitute legal authority. It is more aptly characterized as new evidence not available to the Board at the time of its deliberations and will not be admitted here for the first time on appeal (*Catalano v. Pechous* (1980), 83 Ill. 2d 146, 153-54, *cert. denied* (1981), 451 U.S. 911, 68 L. Ed. 2d 300, 101 S. Ct. 1981; *Gille v. Winnebago County Housing Authority* (1970), 44 Ill. 2d 419, 427). We need not consider whether to admit the Federal Register notice, since it is a matter of public record of which we may take judicial notice. *In re W.S.* (1980), 81 Ill. 2d 252, 257; *People v. Davis* (1976), 65 Ill. 2d 157, 165; see also *Chapman v. Public Utility District No. 1* (9th Cir. 1966), 367 F.2d 163, 167 n.2.

On appeal, the Agency (the Metropolitan Sanitary District has adopted the briefs of the Agency) and the Bloomington-Normal Sanitary District first argue that the appellate court erred in reversing the Board's repeal of the water-quality standard. They contend that this decision was well within the Board's statutory authority under both the Federal Water Pollution Control Act (33 U.S.C.A. secs. 1251 through 1376 (1978)) and the Environmental Protection Act (Ill. Rev. Stat. 1981, ch. 111½, pars. 1001 through 1051), and that the appellate court erred in holding to the contrary. The Board correctly maintains that there is no specific requirement in either the State or Federal statutory scheme that water-quality standards contain a microbiological indicator. The Federal Water Pollution Control Act requires that revised water-quality standards "consist of the designated uses \*\*\* and the water quality criteria for such waters based upon such uses" and that those "standards shall be such as to protect the public health or welfare, enhance the

quality of water and serve the purposes of this chapter." (33 U.S.C. sec. 1313(c)(2) (1976); see also EPA Water Quality Standards, 40 C.F.R. secs. 131.10, 131.11(1983).) Section 13(a) of the Environmental Protection Act (Ill. Rev. Stat. 1981, ch. 111½, par. 1013) delegates authority to the Board to adopt regulations "to promote the purposes and provisions" of the Act and sets forth suggestions for water-quality criteria, but there is no mention of microbiological indicators. (See also 35 Ill. Adm. Code, sec. 301.102.) Section 11(b) provides that the purposes of the Act are "to restore, maintain and enhance the purity of the waters of this State in order to protect health, welfare, property and the quality of life, and to assure that no contaminants are discharged into the waters of the State ***." In light of this broad delegation of power to the Board, we cannot say that by repealing section 302.209 that body acted outside the scope of its statutory authority. It was within the Board's extensive regulatory powers to decide whether a microbiological indicator was necessary to protect recreational waters. Whether that decision may stand is another matter, but any further review of the Board's action must be based on whether it abused its statutory authority by acting arbitrarily or capriciously. *Environmental Protection Agency v. Pollution Control Board* (1981), 86 Ill. 2d 390, 401-02; *Rockford Drop Forge Co. v. Pollution Control Board* (1980), 79 Ill. 2d 271, 278; *Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 310.

In support of its decision to repeal the microbiological water-quality standard, the Board cited the unreliability of the fecal-coliform measure and determined that it "did not correlate well with protection of stream uses." The Board's opinion did not examine whether, if the fecal-coliform standard were to be repealed, another more reliable indicator organism should be adopted, except to

note that those which had been proposed were costly and not well developed.

Noticeably absent from the Board's opinion is any reference to the testimony it heard from bacteriologists and a water microbiologist, who unanimously disapproved of the revised regulatory scheme. Prominent in this group was Edwin Geldreich, chief of the Microbiological Treatment Branch in the Water Supply Research Division for the United States EPA's Cincinnati Environmental Research Center. Mr. Geldreich is a water microbiologist with more than 30 years' experience, including international consulting work, and has published some 60 articles in this field. His testimony undermined the Agency's position that fecal coliform is an inherently unreliable standard, a position endorsed in the Board's opinion. Mr. Walter Ginsburg, a water bacteriologist for the Chicago Water Purification Laboratory with 30 years' experience, also challenged the Agency's finding regarding the fecal-coliform standard. His testimony on this subject is perhaps best summarized by the following statement: "It is true that fecal coliform is not the ideal indicator organism, but no one organism or group of organisms will ever satisfy all the criteria of an ideal fecal pollution indicator." Another bacteriologist with a background in water-quality control and research, Steven Karshen, who is a Chicago Park District sanitation supervisor, objected to repealing the microbiological water-quality standard without any replacement. He stated: "It can no longer be argued that there is no relation between bacterial density and swimming induced illness" and raised a question which the Board's opinion fails to adequately answer: "Why eliminate recreational water quality standards and not offer a replacement?" Given the subject matter of the repealed rule, testimony from these experts should have carried considerable weight.

Moreover, written comments and testimony from

those in the public-health field provides near-unanimous opposition to repeal of the fecal-coliform standard without a replacement. The Board's opinion glosses over objections raised by officials of many local public-health departments and points instead to what it describes as the "support" of the State Department of Health. A representative from the Department, Michael Hines, did testify at the hearings, but his comments concerning the fecal-coliform standard can scarcely be characterized as unqualified endorsement of its repeal. Mr. Hines stated:

> "[W]e feel that fecal coliform is a good indicator organism in comparison to what's available. Now, it may not be easily analyzed or accurately analyzed, but we have done it for so long that the data base is so large *that it becomes a useful indicator organism.*" (Emphasis added.)

The Board's opinion, although it is careful to document the potential health hazards of chlorination, does not examine any health risk the public might incur in the absence of a microbiological indicator. Rather, its opinion essentially ignores the comments of those most qualified to make a judgment in this area, all of whom advocated retention of the fecal-coliform standard unless some other microbiological indicator was adopted. We believe that the Board's rejection of such expert opinion on the need for a bacterial standard, especially in view of its limited examination of any health risks implicated in the repeal of section 302.209, constitutes an arbitrary and capricious use of its regulatory power. Accordingly, we reverse the Board's repeal of section 302.209 and remand for further consideration of the risk to public health in repealing this water-quality standard. We would expect that the Board would consider whether either of the more sensitive indicator organisms proposed by the United States EPA (see 49 Fed. Reg. 21987-88 (proposed May 24, 1984)) should replace the fecal-coliform standard.

We next consider arguments that the appellate court erred in holding that certain of the amendments to the effluent standard, section 304.121, were arbitrary and unreasonable. The Agency contends that the extensive record compiled in this rulemaking, consisting of transcripts of 10 public hearings, records of written public comments, and related exhibits, should alone be sufficient to support the reasonableness of the effluent standard, citing *Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 310. There is no question that a substantial record has been compiled; however, the bulk of this documentation is not concerned with the merits of the amendments to the effluent standard, but with the chlorination issue. Consequently, the size of the record does not establish that the amendments were necessarily carefully considered and therefore reasonable.

The Agency further argues that the amendments should be upheld because they were adopted in view of persistent violations of the repealed water-quality standard. According to the Agency, more than 90% of the State's waste-water-treatment plants complied with the effluent standard, but the in-stream fecal coliform measurements exceeded the maximum about 50% of the time due to sources such as agricultural runoff. This argument, however, does little to support the reasonableness of the amendments. That the bacterial water-quality standard is regularly violated due to agricultural runoff is scarcely a reason to relax a rule which precludes licensed dischargers from further contributing to this problem.

The appellate court found that the amended rule's 20-mile protective zone above licensed beaches and potable and food-processing water supplies was arbitrary and capricious, noting that counsel for the Board had admitted in oral argument that there was very little rational or

scientific merit to the uniform mileage limit (*People v. Pollution Control Board* (1983), 119 Ill. App. 3d 561, 567). The Agency now contends that it would have been reasonable to promulgate an effluent standard even without a requirement that treatment plants within the 20-mile range adhere to the fecal-coliform levels, *i.e.*, the rule could have maintained a bacterial-effluent standard for the protection of interstate waters only since, in the Agency's view, there was very little health risk from treated, but undisinfected, sewage. This argument completely ignores the Agency's original health-related justification for the rule. One of the Agency's chief witnesses, James Park, an engineer and supervisor of its water-pollution-control standards-unit division, testified at the first hearing that plants within the 20-mile zone remained subject to a bacterial standard so that the public would be protected in case a treatment plant should malfunction and release raw or partially treated, unchlorinated sewage. This testimony is scarcely compatible with the Agency's present position that the rule could totally dispense with any bacterial standard except as to interstate waters.

The Board concluded that a distance of 20 stream miles above the specified sites was more closely related to pathogen die-off than the 20-mile distance (apparently not measured in stream miles) found in section 11—125—2 of the Illinois Municipal Code (Ill. Rev. Stat. 1981, ch. 24, par. 11—125—2). Testimony at the hearings established that pathogen die-off depends not on distance alone, but on temperature, flow rate, dilution, and other factors, and the Board's opinion does not dispute that a variety of variables determine the rate of die-off. That opinion approves of the new effluent standard because of its "reasonable consistency" with section 11-125-2. But the obvious purpose of this section at the time of its enactment in the 1870's (see Ill. Ann. Stat., ch. 24, par.

11—125—2, Historical Note, at 723 (Smith-Hurd 1962)) was to establish a 20-mile limit on a municipality's jurisdiction to punish or prevent pollution of the source of its water supply. Its enactment date would seem to eliminate any relationship whatsoever to pathogen decay or to the Agency's present argument. The adoption of the 20-mile amendments on the basis offered in the Board's opinion or on any of the bases argued on appeal is in our opinion an arbitrary action that simply cannot be upheld (see *Environmental Protection Agency v. Pollution Control Board* (1981), 86 Ill. 2d 390, 401-02), especially in view of the absence of any appreciable scientific support.

For the foregoing reasons, we affirm the appellate court insofar as it reversed the Board, and we remand to the Board for further action consistent with this opinion.

*Affirmed and remanded.*