THE PEOPLE *ex rel.* LISA MADIGAN, Attorney General of Illinois, Plaintiff-Appellant, v. DIXON-MARQUETTE CEMENT, INC., *et al.*, Defendants-Appellees.

Second District    No. 2—02—0638

Opinion filed August 27, 2003.

Lisa Madigan, Attorney General, of Chicago (Joel D. Bertocchi, Michael P. Doyle, and Carl J. Elitz, Assistant Attorneys General, of counsel), for appellant.

Michael F. Dolan, Jane K. Murphy, and Jeffrey R. Weiland, all of Jones Day, of Chicago, and Douglas E. Lee, of Ehrmann, Gehlbach, Beckman, Badger & Lee, of Dixon, for appellees.

PRESIDING JUSTICE HUTCHINSON delivered the opinion of the court:

In September 2000 plaintiff, the Illinois Attorney General, filed a nine-count complaint against defendants, Dixon-Marquette Cement, Inc. (Dixon-Marquette), and Prairie Material Sales, Inc. (Prairie Material), seeking injunctive relief and civil penalties based on alleged violations of the Illinois Environmental Protection Act (the Act) (415 ILCS 5/1 *et seq.* (West 2000)) and the Pollution Control Board's (the Board) waste-disposal regulations (35 Ill. Adm. Code Sub Title G (2000)). At issue in this appeal are counts VI through IX, which are premised on defendants' failure to obtain a permit from the Illinois Environmental Protection Agency (the Agency) to conduct a waste-storage, waste-treatment, or waste-disposal operation (415 ILCS 5/21(d)(1) (West 2000)). The trial court granted defendants' motion to dismiss (735 ILCS 5/2—615 (West 2000)), determining that the plain language of section 21(d)(1) of the Act exempted defendants from the permit requirement. The trial court further made a finding pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)), and plaintiff timely appeals. We reverse and remand.

Plaintiff's complaint alleged that defendant Dixon-Marquette operates a cement production business on property in Dixon; the property is owned by defendant Prairie Material. Dixon-Marquette's cement manufacturing process generates a waste by-product called cement kiln dust, which is deposited on the property. Defendants have been depositing cement kiln dust in a pile on the property since at least 1970. The cement kiln dust pile covers an area approximately 30 acres in size and reaches approximately 70 feet high. An analysis of the cement kiln dust revealed that it contains arsenic, barium, chromium, lead, manganese, selenium, and cadmium. The Rock River runs approximately 200 yards from the dust pile, and the wet weather runoff from the dust pile discharges into the river.

■ Section 21(d)(1) of the Act provides:
"No person shall:

* * *

(d) Conduct any waste-storage, waste-treatment, or waste-disposal operation:

(1) without a permit granted by the Agency or in violation of any conditions imposed by such permit, *** as may be necessary to assure compliance with this Act and with regulations and

standards adopted thereunder; provided, however, that, except for municipal solid waste landfill units that receive waste on or after October 9, 1993, no permit shall be required for (i) any person conducting a waste-storage, waste-treatment, or waste-disposal operation for wastes generated by such person's own activities which are stored, treated, or disposed within the site where such wastes are generated ***." 415 ILCS 5/21(d)(1) (West 2002).

Plaintiff's complaint alleged causes of action against defendants for water pollution, water pollution hazard, offensive conditions, open dumping, and causing or allowing litter as a result of the open dumping. Count VI of plaintiff's complaint alleged a cause of action based on defendants' conducting a waste-disposal operation without a permit, in violation of section 21(d) of the Act (415 ILCS 5/21(d) (West 2000)). Count VII alleged numerous violations of the Board's waste-disposal regulations, premised on defendants' failure to apply for and obtain a permit. Count VIII alleged that defendants, without a permit, have disposed of waste at the site. Count IX alleged that defendants violated section 21(d) of the Act and the Board's waste-disposal regulations by failing to provide a properly certified operator to supervise the operations of the facility.

Defendants moved to dismiss the complaint pursuant to section 2—615 of the Code of Civil Procedure (the Code) (735 ILCS 5/2—615 (West 2000)). In their motion, defendants argued that section 21(d)(1) of the Act exempted from the permit requirement facilities that dispose of their own waste at the site where it is generated. Defendants argued that, because Dixon-Marquette generates cement kiln dust at its facility on the property and disposes of the kiln dust on the same property, section 21(d)(1) of the Act does not require them to obtain a permit. Defendants concluded that, because they were not required to obtain a permit, each of plaintiff's counts that was based on defendants' alleged failure to obtain a permit should be dismissed.

The parties fully briefed the issue of whether defendants were statutorily required to obtain a permit to conduct waste storage, treatment, or disposal operations. In support of their motion to dismiss, defendants argued that the plain language of section 21(d)(1) of the Act served to exempt from permitting requirements their on-site disposal operations. In response, plaintiff relied on two appellate court decisions that construed the exemption, *Reynolds Metals Co. v. Pollution Control Board*, 108 Ill. App. 3d 156 (1982), and *Pielet Bros. Trading, Inc. v. Pollution Control Board*, 110 Ill. App. 3d 752 (1982).

In *Reynolds Metals*, the First District considered whether a company was subject to the Act's permit requirements for the on-site

disposal of its wastes generated from its aluminum metal and aluminum alloys fabrication operation. The company's landfill covered $3\frac{1}{2}$ acres and ranged in depth from 80 to 85 feet. Between 1970 and 1979, the wastes deposited included construction waste, banding iron, fluxing tubes, and sludge. Prior to 1970, materials were deposited in the landfill; however, their nature and characteristics were unknown. The Board found that the landfill, due to its permeability, cracks, or fissures, was an extremely dangerous site unless it was properly managed. *Reynolds Metals*, 108 Ill. App. 3d at 160. The Board further found that the amounts of refuse involved were too great and the site was too unsound, presenting "a real potential for serious environmental harm." *Reynolds Metals*, 108 Ill. App. 3d at 159. The Board determined that it was not the type of activity envisioned by the legislature when it enacted the exemption to the section 21(d) permit requirement. *Reynolds Metals*, 108 Ill. App. 3d at 159.

The reviewing court noted that, although the exemption was not applicable to hazardous wastes, the Act did not specifically limit the exemption to wastes posing no potential for environmental harm. *Reynolds Metals*, 108 Ill. App. 3d at 160, citing Ill. Rev. Stat. 1979, ch. $111\frac{1}{2}$, par. 1021(e) (now 415 ILCS 5/21(d) (West 2002)). It determined that, because the parties urged differing interpretations of the exemption, it would look beyond the language of the statute and construe it in a manner consistent with its purpose. *Reynolds Metals*, 108 Ill. App. 3d at 160. In doing so, it determined that the exemption was inapplicable to the company's landfill. *Reynolds Metals*, 108 Ill. App. 3d at 161. In affirming the Board's orders, the reviewing court reasoned that exempting from agency oversight a landfill site "which presents so great a potential for serious environmental harm" would be contrary to the objectives of the permit requirement. *Reynolds Metals*, 108 Ill. App. 3d at 161.

In *Pielet Bros.*, the Fifth District similarly adopted the Board's construction of the section 21 exemption (Ill. Rev. Stat. 1977, ch. $111\frac{1}{2}$, par. 1021(e) (now 415 ILCS 5/21(d) (West 2002))) as it pertained to the permit requirements. *Pielet Bros.*, 110 Ill. App. 3d at 756-57. In *Pielet Bros.*, the record reflected that a company operated an automobile shredder and that, after culling a junk automobile for valuable components and shredding the automobile, the company magnetically removed the ferrous components for resale and discarded the remaining refuse, or "fluff," at the site. The site was approximately 80 acres in size, and the company added approximately 250 cubic yards of fluff to the site per day. The Board considered the size of the site, the daily volume of fluff received, the inflammability of the fluff and the number of on-site fires, the metallic content of the fluff, and

its potential to leach into the water. *Pielet Bros.*, 110 Ill. App. 3d at 755. In determining that the company did not qualify for a permit exemption, the Board concluded that the exemption pertained only to " ' "minor amounts of refuse which could be disposed of without environmental harm upon the site where it was generated" ' [citations]." *Pielet Bros.*, 110 Ill. App. 3d at 754.

Relying on *R.E. Joos Excavating Co. v. Pollution Control Board*, 58 Ill. App. 3d 309 (1978), the reviewing court determined that an ambiguity existed in the statutory language of section 21 and looked beyond the language of the statute to determine the legislative intent. The reviewing court concluded that the exemption "must be given a somewhat more restrictive construction than that suggested by a literal reading of [the statute] standing alone." *Pielet Bros.*, 110 Ill. App. 3d at 755. The reviewing court also considered the amendments to the statute since the Board began construing the statute and noted that the legislature had demonstrated its acquiescence to the Board's interpretation because it had not amended or more specifically defined the exemption. *Pielet Bros.*, 110 Ill. App. 3d at 757. Applying this construction, the reviewing court found that the company's operation did not concern "minor amounts" of refuse and agreed with the Agency's contention that the shredder refuse was not generated by the operator's own activities since, although the company processed junk cars and appliances, they were nevertheless other people's cars and appliances. *Pielet Bros.*, 110 Ill. App. 3d at 757.

On May 18, 2001, the trial court in this case issued a memorandum decision in which it held that, under the plain language of section 21(d)(1) of the Act, defendants were exempted from the permit requirement. In dismissing counts VI through IX of plaintiff's complaint, the trial court rejected the *Reynolds Metals* and *Pielet Bros.* decisions. The trial court expressed its belief that the two cases involved "rationalizations to rubber stamp decisions of the Pollution Control Board by ignoring basic tenets of statutory construction." Plaintiff timely appeals (155 Ill. 2d R. 304(a)).

■ Before considering the merits of plaintiff's appeal, we must address defendants' use of footnotes in their response brief. Supreme Court Rule 341(a) states that "[f]ootnotes, if any, shall be used sparingly." Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(a), eff. October 1, 2001. Additionally, the use of footnotes is "discouraged." 155 Ill. 2d R. 344(b). We have reviewed defendants' brief and determine that most of the 11 footnotes contain argument that should have been presented in the body of the brief. This cannot be characterized as using footnotes "sparingly." We admonish defendants to be more cognizant of our supreme court's rules in the future.

■ Plaintiff brings this appeal following the trial court's dismissal of its complaint pursuant to section 2—615 of the Code (735 ILCS 5/2—615 (West 2000)). A motion to dismiss under section 2—615 of the Code tests the legal sufficiency of a pleading. *Universal Scrap Metals, Inc. v. J. Sandman & Sons, Inc.*, 337 Ill. App. 3d 501, 504 (2003). A section 2—615 motion admits all well-pleaded facts as true, but not conclusions of law or factual conclusions that are unsupported by allegations of specific facts. *Raintree Homes, Inc. v. Village of Long Grove*, 335 Ill. App. 3d 317, 319 (2002). A motion to dismiss under section 2—615 of the Code is properly granted when the complaining party fails to state a cause of action upon which relief can be granted. *Neade v. Portes*, 193 Ill. 2d 433, 439 (2000). To state a cause of action, a complaint must be both legally and factually sufficient; it must set forth a legally recognized claim as its basis for recovery and must plead facts that bring the claim within the legally recognized cause of action alleged. *Morris B. Chapman & Associates, Ltd. v. Kitzman*, 307 Ill. App. 3d 92, 104 (1999). Whether a viable cause of action has been pleaded is a question of law, and our review is *de novo. Weiss v. Waterhouse Securities, Inc.*, 335 Ill. App. 3d 875, 882 (2002).

Plaintiff and defendants advance many of the same arguments on appeal as they did in the trial court. Plaintiff, relying on the analyses and holdings of *Pielet Bros.* and *Reynolds Metals*, argues that reviewing courts and the Board have long construed the exemption as applying only to "operations which produce minor amounts of waste and which do not pose a threat to the environment." Plaintiff also argues that, despite legislative modifications to the statute, the judicial and administrative construction of section 21(d)(1) of the Act is still intact and has not been abrogated. Last, plaintiff argues that *stare decisis*, legislative acquiescence, and the Act's underlying objectives should persuade this court to accept the other reviewing courts' construction of section 21(d)(1) of the Act.

Defendants, on the other hand, counter that section 21(d)(1) of the Act unambiguously expresses the legislature's intent that on-site disposal of the cement kiln dust generated by Dixon-Marquette does not require a permit. Defendants argue that, because the statutory language unambiguously exempts such operations, we need not resort to the statutory purpose or other extrinsic aids to restrict or modify the statutory language. Defendants further argue that the reviewing courts' 1982 decisions in *Pielet Bros.* and *Reynolds Metals* were wrongly decided and, in any event, are not binding precedent on this court. Last, defendants argue that statutory and regulatory changes since 1982 have abrogated the holdings in *Pielet Bros.* and *Reynolds Metals* and that subsequent amendments to the statute reaffirm the

legislature's intent, expressed through the plain language of the statute, and demonstrate that Dixon-Marquette's on-site disposal of its cement kiln dust is exempt from the permit requirement.

■ In determining whether the trial court erred when it dismissed counts VI through IX of plaintiff's complaint, we must determine the scope and applicability of the section 21(d)(1) exemption to defendants' operations. It is well settled that the court's role in construing statutes is to ascertain and give effect to the intent of the legislature. *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350, 362 (1986), citing *Dornfeld v. Julian*, 104 Ill. 2d 261, 266 (1984); *Waste Management of Illinois, Inc. v. Environmental Protection Agency*, 137 Ill. App. 3d 619, 627 (1985). In ascertaining the intent of the legislature, the court examines the statutory enactment and seeks " 'to determine the objective the statute sought to accomplish and the evils it desired to remedy.' " *Harris*, 111 Ill. 2d at 362, quoting *Springfield v. Board of Election Commissioners*, 105 Ill. 2d 336, 341 (1985). The courts presume that the General Assembly, in passing legislation, did not intend absurdity, inconvenience, or injustice (*Harris*, 111 Ill. 2d at 363, citing *Illinois Crime Investigating Comm'n v. Buccieri*, 36 Ill. 2d 556, 561 (1967)), and a statute will be interpreted to avoid a construction that would raise doubts as to its validity (*Harris*, 111 Ill. 2d at 363, citing *Morton Grove Park District v. American National Bank & Trust Co.*, 78 Ill. 2d 353, 363 (1980)).

As stated earlier, section 21(d)(1) of the Act provides that "[n]o person shall *** [c]onduct any *** waste-disposal operation *** without a permit ***[;] however, *** no permit shall be required for *** any person conducting a *** waste-disposal operation for wastes generated by such person's own activities which are stored, treated, or disposed within the site where such wastes are generated." 415 ILCS 5/21(d)(1) (West 2002). We recognize that the exemption in section 21(d)(1) of the Act has been judicially interpreted previously in *Pielet Bros.* and *Reynolds Metals* and that considerations of *stare decisis* weigh heavily because the legislature is free to change court interpretations of its legislation. See *Spiel v. Property Tax Appeal Board*, 309 Ill. App. 3d 373, 378 (1999). However, because this is the first occasion that this issue has been presented in the Second District, we will perform our own independent analysis. See *Schiffner v. Motorola, Inc.*, 297 Ill. App. 3d 1099, 1102 (1998) (doctrine of *stare decisis* does not bind courts to follow decisions of equal or inferior courts).

■ A brief history of the Act and its relevant provisions is instructive to our statutory analysis. The General Assembly enacted the Environmental Protection Act in 1970. Pub. Act 76—2429, eff. July 1, 1970. In adopting the Act, the legislature intended to address the

environmental problems of the state on a unified statewide basis. 415 ILCS 5/2(a)(ii) (West 2002); *City of Elgin v. County of Cook*, 169 Ill. 2d 53, 67 (1995). This goal of unified statewide enforcement extends to, *inter alia*, air and water pollution, noise, the public water supply, and, not insignificantly, solid waste disposal. 415 ILCS 5/2(a)(iii) (West 2002); *City of Elgin*, 169 Ill. 2d at 67. The Act's purpose is "to restore, protect, and enhance the quality of the environment, and to assure that adverse effects upon the environment are fully considered and borne by those who cause them." 415 ILCS 5/2(b) (West 2002); *People ex rel. Ryan v. McFalls*, 313 Ill. App. 3d 223, 226 (2000). The Act should be liberally construed. 415 ILCS 5/2(c) (West 2002). The General Assembly has charged the Board and the Agency with implementing the Act. 415 ILCS 5/4, 5 (West 2002); *City of Elgin*, 169 Ill. 2d at 60.

■ The Board establishes environmental standards and regulations and also adjudicates enforcement matters. 415 ILCS 5/5 (West 2002); *City of Elgin*, 169 Ill. 2d at 60. The Board consists of seven "technically qualified members." 415 ILCS 5/5(a) (West 2002). In *Landfill, Inc. v. Pollution Control Board*, 74 Ill. 2d 541 (1978), our supreme court recognized that the Board has both quasi-legislative and quasi-judicial functions:

"The Board, which was created by the Act [citation], serves both quasi-legislative and quasi-judicial functions within a statutorily established framework. It must determine, define, and implement the environmental control standards and may adopt rules and regulations [citation]. It has authority to conduct hearings upon, among other specified matters, complaints charging violations of the Act or of regulations thereunder and upon petitions for review of the Agency's denial of a permit as well as authority to hold other such hearings as may be provided by rule [citation]. It may adopt substantive regulations and procedural rules to accomplish the purposes of the Act [citation]." *Landfill*, 74 Ill. 2d at 554.

The *Landfill* court continued:

"The Agency too was created by the Act [citation] and performs technical, licensing, and enforcement functions. It has the duty to collect and disseminate information, acquire technical data, and conduct experiments to carry out the purposes of the Act [citation]. It has the authority to conduct surveillance and inspection of actual or potential pollution sources [citation]. It has the duty to investigate violations of the Act, regulations, and permits [citation]. The Agency must appear before the Board in hearings on the denial of permits, among other specified instances, and may appear in any other hearing under the Act [citation]. The Agency has the duty to administer permit systems established by the Act or regula-

tions and has the authority to require permit applicants to submit plans and specifications and reports regarding actual or potential violations of the Act, regulations or permits [citation]." *Landfill*, 74 Ill. 2d at 554.

The Board's principal function is to adopt regulations defining the requirements of the permit system. 415 ILCS 5/5(b), 39 (West 2002); *Landfill*, 74 Ill. 2d at 557. The legislature meted a grant of authority to the Board to "determine, define, and implement the environmental control standards." 415 ILCS 5/5(b) (West 2002); *Landfill*, 74 Ill. 2d at 554. Merriam Webster's Collegiate Dictionary gives one definition of "determine" as "to fix the boundaries of," "to limit in extent or scope." Merriam Webster's Collegiate Dictionary 315 (10th ed. 1996). Black's Law Dictionary gives one of the meanings of "define" as "[t]o explain or state the exact meaning of words and phrases; to state explicitly; to limit; to determine essential qualities of; to determine the precise signification of." Black's Law Dictionary 422 (6th ed. 1990).

■ In light of the foregoing principles and definitions, the Board's function of determining and defining the scope of the section 21(d)(1) exemption is a quasi-legislative act. See *Environmental Protection Agency v. Pollution Control Board*, 86 Ill. 2d 390, 400 (1981) (concerning the scope of emission standards). On the other hand, the Board's *decision* whether a particular party is entitled to the section 21(d)(1) exemption is a quasi-judicial act. See *Environmental Protection Agency*, 86 Ill. 2d at 400. Given that our legislature enacted section 21(d)(1), which includes the exemption, and given that our legislature granted quasi-legislative authority to the Board to determine, define, and implement environmental control standards regarding waste management, it seems logical and appropriate that we consider the Board's quasi-legislative determinations and definitions to determine the scope of the permit exemption in section 21(d)(1), rather than construing section 21(d)(1) in isolation. In doing so this court avoids an absurd and unjust result that would defeat the legislature's obvious and clearly expressed purpose. See *Harris*, 111 Ill. 2d at 363.

■ To be more precise, section 20 of the Act states this purpose to be prevention of pollution or misuse of land arising out of improper waste disposal. 415 ILCS 5/20 (West 2002). To achieve this end the legislature established a permit system controlling waste-disposal activities. 415 ILCS 5/5, 39 (West 2002). The intent of section 21(d)(1) of the Act was not to create a legislative loophole or gap in the permit system. To allow defendants' literal interpretation of section 21(d)(1) would result in operators disposing their waste product or by-product indiscriminately, without regard for the amount or type of waste, and without accountability for the resulting pollution of our air, water, and

other resources. This literal interpretation achieves nothing other than circumventing both the permit system and the purposes of the Act. We therefore reject defendants' interpretation of the exemption.

Turning to a consideration of the Board's construction of the exemption at issue, the case *Environmental Protection Agency v. City of Pontiac*, Ill. Pollution Control Bd. Op. 74—396 (August 7, 1975), appears to be one of the first interpretations of the exemption by the Board. In that case, the City of Pontiac was alleged to have operated a solid waste management site without a permit in violation of the solid waste regulations and section 21(e) (the former version of section 21(d)) of the Act. Pontiac moved to dismiss on the basis that it was exempt from the permit requirement under section 21(e) of the Act because its waste disposed of at the site constituted "refuse generated by the operator's own activities." *Pontiac*, slip op. at ___.

The Board first considered its definitions of "refuse" and "person" and noted that it had no definition of "operator." Nonetheless, the Board concluded that Pontiac was not entitled to the exemption. Acknowledging its difficulty in interpreting the statute, the Board stated:

> "We reject Pontiac's contention that mere ownership of the refuse brings it within the scope of the exemption. Section 21[ ] and its exemption must be interpreted consistently with the purposes of the Act. Title V, Section 20 states this purpose to be prevention of pollution or misuse of land arising out of improper refuse disposal. To achieve this end the Regulations establish a permit system controlling refuse-disposal activities. *The intent of Section 21[ ] was to exempt minor amounts of refuse which could be disposed of without environmental harm on the site where it was generated.* There was no intent to create a gap in the permit system of the magnitude suggested by Pontiac. To interpret the exemption as allowing the municipality to dispose of any refuse it owns without a permit will mean that large quantities of varied materials could be indiscriminately deposited at a waste-disposal site. This obviously circumvents both the permit system and the purposes of the Act." (Emphasis added.) *Pontiac*, slip op. at ___.

Since *Pontiac* was decided, the Board has reaffirmed its construction of the section 21(d)(1) exemption applying only to the disposal of minor amounts of waste that could be disposed of without environmental harm on the site where it was generated. See *Reynolds Metals Co. v. Environmental Protection Agency,* Ill. Pollution Control Bd. Op. 79—81 (August 20 and November 19, 1981), *aff'd sub nom. Reynolds Metals Co. v. Pollution Control Board,* 108 Ill. App. 3d 156 (1982); *People v. Commonwealth Edison Co.,* Ill. Pollution Control Bd. Op. 75—368 (November 10, 1976).

■ Defendants correctly state that administrative interpretations by the agency charged with administering a statute are entitled to respect and deference from a reviewing court but are not binding on the court. See *Van's Material Co. v. Department of Revenue*, 131 Ill. 2d 196, 202-03 (1989). We recognize this principle and note that the Board's opinion letter in *Pontiac*, while entitled to deference, is therefore not binding upon this court. See *Ogle County Board v. Pollution Control Board*, 272 Ill. App. 3d 184, 191 (1995) ("courts will give substantial weight and deference to the interpretation of a statute by the agency charged with its administration and enforcement").

■ In our aim to harmonize section 21(d)(1) of the Act with provisions elsewhere in the Act, we construe section 21(d)(1) as providing an exemption to those on-site facilities that generate minor amounts of waste that can be disposed of without a significant threat of environmental harm. Accord *Pielet Bros.*, 110 Ill. App. 3d 752; *Reynolds Metals*, 108 Ill. App. 3d 156; *R.E. Joos*, 58 Ill. App. 3d 309. We recognize that the protection of the public interest is the central concern in the storage, treatment, and disposal of waste, regardless of the party generating the waste or the location in which it is being generated. We believe our decision here achieves a level of unity between the purposes and goals of the Act and the statutory enactment as a whole.

■ Each individual claim for exemption must be determined from the facts presented. See *Coyne Electrical School v. Paschen*, 12 Ill. 2d 387, 394 (1957). In the present case, the facts taken from plaintiff's complaint, which shall be admitted as true (see *Raintree Homes*, 335 Ill. App. 3d at 319), reflect that Dixon-Marquette has been generating and depositing cement kiln dust on Prairie Material's property for more than 30 years. Cement kiln dust is comprised of, among other things, contaminants such as arsenic, barium, chromium, lead, manganese, selenium, and cadmium. The cement kiln dust pile reaches 70 feet high and covers 30 acres. Wet weather runoff from the dust pile flows into the Rock River, approximately 200 yards away. Further, a 1998 examination of the runoff reflected that it contained pH levels beyond what the Act permits for discharges into state waters.

We believe that an amount of cement kiln by-product covering 30 acres and extending 70 feet into the air is not a minor amount of waste that can be disposed of without a significant threat of environmental harm. Moreover, Dixon-Marquette's disposal and storage of its cement kiln dust is a proper subject for a permit evaluation by the entity charged with the duty to prevent the pollution and misuse of land (see 415 ILCS 5/20 (West 2002)), and the section 21(d)(1) exemption is inapplicable to defendants' operation. Plaintiff has therefore pleaded a proper cause of action.

In so holding, we also reject defendants' arguments regarding the abrogation of the *Pielet Bros.* and *Reynolds Metals* decisions and the Board's construction of the exemption by way of legislative amendments to section 21(d). Defendants point to various amendments to section 21 of the Act in an attempt to demonstrate that the decisions in *Pielet Bros.* and *Reynolds Metals* are no longer good law. In the *Commonwealth Edison* opinion letter, the Board noted that its *Pontiac* opinion letter was before the legislature when the first amendment to section 21(e) was executed. See *Commonwealth Edison*, slip op. at ___. The *Pontiac* opinion letter was issued August 7, 1975, and the first amendment did not become effective until October 1, 1975. See Pub. Act 79—762, eff. October 1, 1975. Had the legislature found the Board's interpretation of the exemption set out in the *Pontiac* opinion letter misleading or incorrect, it should have been reflected in the October 1975 amendment. We believe that the legislature's decision not to amend section 21(e) in response to the *Pontiac* opinion letter indicates an intent to leave the quasi-legislative definitions, determinations, and implementations of the environmental control standards to the seven "technically qualified members" of the Board. See 415 ILCS 5/5(a) (West 2002).

Further, we note that both the *Pielet Bros.* and *Reynolds Metals* cases were decided in 1982. Since that time, the legislature has amended section 21 of the Act numerous times; however, none of those amendments reflect a reconsideration or clarification in response to the decisions. It is a fundamental principle that, "[w]here the legislature chooses not to amend a statute after a judicial construction, it will be presumed that it has acquiesced in the court's statement of the legislative intent." *Miller v. Lockett*, 98 Ill. 2d 478, 483 (1983). In further support of our holding here, we believe that the legislature's declination to amend or more specifically define the section 21(d)(1) exemption following the decisions in *Pielet Bros.* and *Reynolds Metals* demonstrates legislative acquiescence to the Board's and the court's interpretation of the exemption.

Accordingly, we conclude that the trial court erred when it dismissed counts VI through IX of plaintiff's complaint.

Therefore, for the foregoing reasons, we reverse the judgment of the circuit court of Lee County and remand for further proceedings.

Reversed and remanded.

BOWMAN and BYRNE, JJ., concur.